EDWARD W. GUINN and ADDIE L. GUINN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Guinn v. Commissioner
Docket No. 13538-79
United States Tax Court
T.C. Memo 1983-401; 1983 Tax Ct. Memo LEXIS 383; 46 T.C.M. (CCH) 709; T.C.M. (RIA) 83401; July 13, 1983. M. Clifton Maxwell, for the petitioners. Raymond L. Collins, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes and additions to taxes for the years 1967 through 1972 in the amounts as set forth below: Edward W. Guinn
Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a) [1]
1967
$4,271.93
$2,135.97
$136.36
1968
6,567.22
3,283.61
204.56
1969
7,470.98
3,735.49
238.50
1970
11,507.48
5,753.74
367.36
1971
12,079.20
6,039.60
385.61
1972
10,806.09
5,403.05
344.95
Addie L. Guinn
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)
Sec. 6654(a)
1967
$3,849.53
$962.38
$192.48
$122.88
1968
6,068.02
1,517.01
303.40
188.62
1969
6,932.78
1,733.20
346.64
221.31
1970
11,308.81
2,827.20
565.44
361.02
1971
11,851.95
2,962.99
592.60
378.34
1972
10,528.59
2,632.15
526.43
336.09
*385 The issues for decision are (1) whether petitioners are entitled to various deductions as business expenses and other items in addition to those allowed by respondent, (2) whether petitioners are entitled to depreciation deductions in excess of the amounts allowed by respondent for each of the years here in issue, (3) whether petitioners are entitled to casualty loss deductions in certain of the years here in issue, (4) whether petitioners are entitled to loss or bad debt deductions in certain of the years here in issue, (5) whether a part of the underpayment of tax by petitioner Edward W. Guinn was due to fraud with intent to evade tax in each of the years here in issue, (6) whether each petitioner is liable for the addition to tax under section 6654(a) for failure to pay estimated tax for each year here in issue, and (7) whether petitioner Addie L. Guinn is liable for additions to tax under section 6651(a)(1) for failure to file a return and under section 6653(a) for negligence or intentional disregard of rules and regulations for each of the years here in issue. [2]
*386 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife, and were husband and wife during all the years here in issue, having been married in 1944. At the time of filing their petition in this case petitioners resided in Fort Worth, Texas. Edward W. Guinn (petitioner) was born in January 1925 in Fort Worth, Texas. He received a bachelor of science degree from Prairie View A & M and attended graduate school at Howard University in Washington, D.C. and the University of Colorado. He received a medical degree from the University of Texas at Galveston, and after an internship at Philadelphia General Hospital and a residency at Lower Bucks County Hospital in Bristol, Pennsylvania, petitioner returned to Fort Worth, Texas. In mid-1958 he opened his medical practice and has continued from that time to the time of the trial of this case to be engaged in the practice of medicine in Fort Worth, Texas. He was actively engaged in the practice of medicine during all the years 1960 through 1972. During many of these years petitioner received substantial payments through Medicare and Medicaid. Petitioners have not filed *387 Federal income tax returns for any of the years 1960 through 1972. Petitioners filed Federal income tax returns for the years 1958 and 1959. Commencing with the calendar year 1973, petitioners have filed tax returns, but have not paid all the taxes shown as due and owing on those returns. In the early 1960's, petitioner purchased a drugstore known as the Ramey Avenue Pharmacy. Initially, he leased the pharmacy to a third party, but in 1964 he began operating the pharmacy in conjunction with his medical practice. During the years 1967 through 1972, petitioner operated the Ramey Avenue Pharmacy as a sole proprietorship. During the years 1968 through 1972, petitioner in his medical practice utilized the services of Data Processing Service Company to prepare detailed schedules reflecting monthly fees and receipts analyses. The information utilized by Data Processing Service Company was furnished to that company daily by employees of petitioner. [3]
*388 On or about December 29, 1965, petitioner and Norman A. Vick entered into a purchase agreement to acquire a 74-bed hospital located at 3808 South Central Expressway, Dallas, Texas, known as Dallas General Hospital. Under the terms of the purchase agreement, petitioner and Mr. Vick issued a nonrecourse note in the principal amount of $201,500, dated December 29, 1965, payable to Richard W. Mackay. Principal payments of $2,237.67 were to be made in 120 monthly installments. Interest on the note was to be paid commencing July 1, 1966. Immediately after purchasing the hospital, petitioner formed a corporation, Dallas General Hospital, Inc. He purchased Mr. Vick's interest in the hospital and transferred the hospital to the corporation he had formed. Neither the corporation, petitioner nor Mr. Vick made any principal payment, and the interest payment due July 1, 1966, was defaulted. Mr. Mackay foreclosed on the property on or about September 30, 1966, and on October 4, 1966, filed a Petition and Application for Temporary Restraining Order and Injunction seeking to oust petitioner and Mr. Vick from the hospital property. On November 21, 1966, Dallas General Hospital, Inc., was *389 forced into bankruptcy by its creditors filing an Involuntary Petition in Bankruptcy. On January 6, 1971, the bankrupt's estate was closed. On the Statement of Affairs filed by the corporation on August 31, 1967, in connection with the bankruptcy proceeding the business of the corporation was listed as being "General Hospital-terminated Oct. 4, 1966." Dr. Guinn was listed as president of the corporation and its sole shareholder. The Statement of Affairs signed by Dr. Guinn as president of the bankrupt corporation contained a list of creditors. Dr. Guinn was listed as an unsecured creditor on a note payable in the amount of $20,358.89. The final order of the trustee was entered on October 14, 1970, and as heretofore stated the bankrupt estate was closed by order dated January 6, 1971. Dr. Guinn, along with the other unsecured creditors, remained unpaid at the closing. [4]
*390 In the years 1969, 1970 and 1971, petitioner paid certain expenses of his father's estate of which he was administrator, totaling $1,118.52, $1,323.93 and $1,185.35, respectively. These payments related to taxes, maintenance of the properties in the estate, repairs, travel expenses going to and from the properties and similar types of items. Petitioner was entitled to reimbursement for these expenses from the estate but elected not to take such reimbursement. In 1969, petitioner took a 1962 Chrysler automobile he owned to a body shop for repairs.The car was stripped and later was disposed of by the body shop. Petitioner claims a casualty loss in 1969 of $800 with respect to the 1962 Chrysler. In the late spring of 1969 petitioner purchased a new 1969 Chrysler station wagon. Shortly thereafter his wife was involved in an accident while driving this automobile, and the automobile was returned to the dealership from which it had been purchased for repairs.For the year 1970 petitioner claimed a casualty loss of $9,571.50 with respect to the 1969 Chrysler station wagon. In 1971 petitioner had a fire in his kitchen, and his 22-year-old daughter who lived away from home had her *391 apartment broken into and some of her jewelry and clothing were stolen. Petitioner claims a casualty loss of $405 with respect to the fire and $1,475 with respect to the theft from his daughter's apartment. Mrs. Guinn met Dr. Guinn while she and Dr. Guinn were both attending college at Prairie View A & M.She completed 2 years of college in nursing and during her third year married Dr. Guinn. She did not complete her nursing course. She and Dr. Guinn had 8 children and she spent her time as a homemaker and in looking after the children. However, she did read newspapers and sometimes magazines. She kept up with her children's homework and knew what they were studying in school. She wrote checks which had been signed by her husband for various expenses, including household expenses, after checking with her husband's office that money was available for her to write the checks. She considered that business affairs, including the filing of tax returns, were the responsibility of her husband. On or about December 23, 1971, petitioner purchased five horses from an individual for $2,725. He had a horse trainer to train one of the horses for show purposes; however, none of the horses *392 were shown. The horses were sold in 1973 because their maintenance was too high. None of the horses petitioner bought were of show quality. One of petitioners' children used the horses for riding. In 1968 petitioners purchased a large family home located on 13.74 acres of land. During the years here in issue, petitioners employed a full-time maid and also had either a full or part-time gardener. In 1973 petitioner installed a swimming pool at his home at a cost of between $13,000 and $16,000. For years prior to 1965, petitioners took the material for preparation of petitioners' tax returns to an accountant who prepared returns for petitioners and told petitioners that they had an obligation to file the returns. Petitioner continued to have contact with his accountant at least through 1970. Petitioner Addie L. Guinn inherited some farmland in 1958 and petitioners in the latter part of the years here in issue made substantial improvements to that farmland. In 1968 petitioner made nondeductible personal expenditures of $46,699. In 1969, 1970, 1971 and 1972 he made similar expenditures of $44,119, $61,148, $62,798 and $67,108, respectively. Petitioner sent his children *393 to private schools. Respondent computed petitioners' income and deductions for each of the years here in issue in part from Dr. Guinn's records maintained for his medical practice and in part from bank deposits. Respondent determined deductions for business expenses and other items from the same sources. Respondent determined that for each year here in issue the net income he computed should be divided between petitioner and Mrs. Guinn in accordance with the community property laws of the State of Texas. He determined that part of the underpayment by petitioner for each year in issue was due to fraud and that part of the underpayment by Mrs. Guinn in each year in issue was due to negligence or intentional disregard of rules and regulations. Respondent also determined an addition to the tax for petitioner and Mrs. Guinn for failure to pay estimated tax and an addition to the tax of Mrs. Guinn for failure to file returns. Petitioners do not contest the gross income as determined by respondent for each year but contend that they are entitled to additional business expense deductions and to various other deductions. Petitioner contends that he is not liable for the addition *394 to tax for fraud or for failure to pay estimated tax. Mrs. Guinn contests all the additions to her tax determined by respondent. OPINION The issues in this case are purely factual. There is no evidence in the record concerning the claimed deductions other than depreciation of the buildings, the horses purchased, the casualty losses and the claimed loss with respect to the hospital. The burden is on petitioners to show that they are entitled to the deductions claimed in the petition. Petitioners have failed to substantiate the deductions claimed for items with respect to which they have offered no evidence. We therefore sustain respondent's determination with respect to petitioners' allowable deductions for business expenses, charitable deductions, medical expenses and the other miscellaneous items petitioners claim to be deductible with respect to which they offered no evidence.
There is very little evidence with respect to the proper amount of depreciation for the buildings. The main issue between the parties concerns whether the useful life of the medical and pharmacy buildings should be 15 years from the date of acquisition as claimed by petitioner or 30 years from that *395 date as determined by respondent. Although the evidence shows that the medical and pharmacy buildings were frame buildings, there is insufficient evidence in the record to show that the buildings had a useful life of less than 30 years. Respondent separately computed depreciation on the medical building and the pharmacy building since the two were acquired at different times. He failed to allow depreciation of $446.67 on the pharmacy building for 1967, which is the amount of depreciation on this building for that year in accordance with respondent's computation. Respondent conceded both at trial and on brief that he was incorrect in failing to allow this amount of depreciation in 1967. The record does not contain sufficient information to show error in respondent's use of a 30-year useful life for the medical and pharmacy buildings. The burden of showing error is on petitioners. Radio Station WBIR, Inc. v. Commissioner,31 T.C. 803, 817 (1959). It does not necessarily follow from the fact that buildings are frame that their useful life is only 15 years. We therefore *396 sustain respondent's determination as to the depreciation items except to the extent that he has conceded error in failing to allow depreciation on the pharmacy building for the year 1967. In 1969 petitioner claimed a casualty loss of $800. According to petitioner, he took a 1962 Chrysler automobile he owned to a body repair shop to have some repairs made on it and to have it painted. Petitioner stated that the car was essentially stripped and the body shop assumed no responsibility for the loss. Petitioner testified that the car was subsequently disposed of by the body shop and he did not receive payment either from the body shop or the salvage place. Petitioner estimated the value of the car at $800 because he had been offered an $800 amount for this car as a trade-in on a new car he was contemplating purchasing. Petitioner testified that he did not receive insurance reimbursement for the 1962 Chrysler. The record totally fails to show the circumstances of the stripping of the car or why petitioner did not take the car, even in its stripped condition, and attempt to get the best price he could for it. The evidence does not show the value of the 1962 Chrysler at the time *397 petitioner took it to the body shop.Its value may have been less than $100 insofar as this record shows. The fact that petitioner had been offered a trade-in of $800 on a new car for the 1962 Chrysler does not establish its value before the alleged casualty. This amount may have in effect been offered as a trade-in in lieu of a discount on the new car petitioner was contemplating purchasing. There is no showing as to the value of the car as stripped had petitioner taken the car and attempted to dispose of it. If in fact any casualty with respect to the car did occur, this record does not show that the amount of the loss was in excess of the $100 deductible with respect to each casualty loss in each year. Section 165(c)(3). We therefore conclude that petitioner has failed to show that he is entitled to a casualty loss deduction in 1969. For the year 1970 petitioner claims a casualty loss of $9,571.50. Petitioner's explanation for this claim is that in the late spring of 1969 he purchased a new Chrysler station wagon which was involved in an accident 3 months later. Petitioner stated that his wife who was driving the car was injured and the car was towed to the dealer from *398 which it had been purchased for repair.Petitioner called the dealer after a 2-week period to ask when the car would be ready and was told it would be a week or two. He continued to call at intervals of a week or 2 weeks and would get the reply that the car would be ready next week. After a substantial length of time, petitioner went out to the location of the dealer to determine why it was taking so long to repair the car. When he arrived at the Chrysler dealership, there was a fence with a chain and lock on it around the property and the property was vacant. Petitioner hired an attorney to investigate the situation and was informed by his attorney that the dealership had gone into bankruptcy. Neither petitioner nor his attorney was able to locate the car. However, in 1972 when petitioner had another car at a repair shop some distance from the location of the dealership that was to repair his 1969 Chrysler station wagon, he saw a station wagon which he decided was his. He looked at the car, decided it was his car, and inquired how it had gotten there. He was informed that the body shop across the street brought it in. Employees of this shop had been driving the car. Petitioner *399 was advised by his attorney to just hook a wrecker to the car and pull it home since he had the title to the car. However, he did not do this and later on the car was impounded in a sheriff's pound and was put up to be auctioned off. Petitioner bid $2,975 on the car in order to get it back and had some repairs made on it and drove it for several years. He got an award from the court for $260 from the person who had received his car from the dealer and that was all the reimbursement he received. Petitioner testified that the car cost around $7,000 when he initially purchased it and that amount, added to the $2,975, was the manner in which he arrived at the casualty loss. It is unmistakably clear that petitioner suffered no casualty loss in 1970 with respect to the 1969 Chrysler station wagon. Since petitioner claimed the casualty loss in 1970 and in no other year, that should dispose of the matter. Certaintly, if the car was in an accident in 1969, there is a possibility that petitioner suffered some casualty loss in connection with the car in that year, but there has been no showing as to the amount, if any, of the casualty loss in that year. There is no showing of whether *400 the dealership that petitioner testified went into bankruptcy had a lien on the car. If it did, this might explain why the car was disposed of as property of the bankrupt. Petitioner has not shown why he waited for several months after the claimed accident to look into the whereabouts of the car. Based on the evidence in the record, petitioner has failed to establish any amount of casualty loss with respect to the 1969 Chrysler station wagon.
Petitioner explained that the claimed casualty loss in 1971 to the extent of $405 resulted from a fire in his kitchen and the remaining claimed casualty loss of $1,475 resulted from a theft of items that he had given his adult daughter.The only evidence he offered with respect to the kitchen fire was his testimony that he had to have some repainting done. This record is totally insufficient to establish the claimed casualty loss from the kitchen fire. Petitioner testified that his daughter had an apartment in Divide, Colorado, which was broken into and that a number of items were taken. Petitioner has not identified the items nor shown the value of the items taken from his daughter's apartment.However, even if he had made such a showing, *401 it is clear that petitioner is not entitled to a casualty loss deduction for the theft from his adult daughter's apartment in Divide of items that belonged to her even though he had given the items to her. See Draper v. Commissioner,15 T.C. 135 (1950). Petitioner, for the year 1970, claimed a loss of $70,000 with the designation "Dallas General Hospital." As best we can determine from the sparse facts in this record, petitioner and another individual purchased a leasehold interest in a hospital on December 29, 1965. They gave a note to the seller, but no amount was ever paid on the note. Shortly after the purchase of the hospital, the other individual transferred his interest in the hospital to petitioner and petitioner formed a corporation to which he transferred the leasehold interest in the hospital. Since no payments were made on the note, the seller foreclosed on the leasehold interest in October 1966 and petitioner was ousted from the hospital. Later in 1966 the corporation to which the leasehold interest was transferred was declared a bankrupt. Insofar as this record shows, the only amount petitioner ever put into the Dallas General Hospital, Inc. *402 was $20,358.89, which he lent the hospital on September 24, 1966, and for which he received a demand note from the hospital. Petitioner made a claim for the $20,358.89 in the bankruptcy proceedings but never received any payment on the note. The record shows that the hospital was taken over in October 1966 by the person who had sold it to petitioner and the other individual. The indication from the record is that after the hospital was repossessed, the corporation to which petitioner had made the $20,358.89 loan was insolvent. Respondent on brief concedes that petitioner suffered a nonbusiness loss of $20,358.89 in 1966 when the hospital was taken over. Certainly on the face of this record there is nothing to indicate that there was any value to petitioner's indebtedness after the repossession of the hospital in 1966. Also, it appears that the $20,358.89 was a loan by petitioner to his wholly owned corporation and when it became worthless, it was a nonbusiness bad debt which resulted in a short-term capital loss. Section 166(d); Putnam v. Commissioner,352 U.S. 82 (1956); see also Whipple v. Commissioner,373 U.S. 193 (1963). There is no basis *403 in this record for us to determine that the loss occurred in any year other than the year 1966, which is the year respondent conceded that the loss occurred. We therefore conclude that petitioner sustained a short-term capital loss of $20,358.89 in 1966. If this capital loss results in any capital loss carryover as provided by the statutes applicable to the years here in issue, the parties may determine the effect on petitioner's income for these years in a recomputation under Rule 155. There is absolutely no evidence in this record to sustain any loss in addition to the $20,358.89. We recognize that petitioner testified that he advanced or, as he stated, "put into the hospital" other funds. His testimony was to the general effect that he put between $10,000-$40,000 into the hospital. The record is too vague for us to find that petitioner sustained any loss with respect to the hospital other than the $20,358.89 which respondent conceded is a nonbusiness bad debt loss in 1966. For the years 1969, 1970 and 1971, petitioner claimed deductions for an estate expense in the amounts of $1,118.52, $1,323.93 and $1,185.35, respectively. The record shows that petitioner was the administrator *404 of his father's estate and that in this capacity he expended in the years 1969, 1970 and 1971 the amounts he claimed to be deductible as an estate expense.However, the record is completely clear that these expenses were expenses of the estate and that petitioner was entitled to be reimbursed from the estate for these expenditures. The record shows that the estate was able to reimburse petitioner. Ordinarily a taxpayer may not be allowed a deduction for expenses paid for another for which he chooses not to take reimbursement. See Wofford v. Commissioner,5 T.C. 1152, 1165 (1945), and cases there cited. Here, the estate and petitioner are different entities. Petitioner argues that there was real estate in his father's estate and that under Texas Law real estate passes directly to heirs. Petitioner contends that for this reason he should be entitled to the claimed deductions. The difficulty with petitioner's argument is that his testimony is absolutely clear that the expenditures were expenses of the estate for which he was entitled to be reimbursed by the estate. We *405 therefore conclude that petitioner is not entitled to the deductions claimed as "estate expenses." For the years 1971 and 1982, petitioner claimed deductions of $5,551.30 and $5,684.12, respectively, as losses from a "horse business." The parties have stipulated that on or about December 23, 1971, petitioner purchased five Paint horses from a person by the name of Bob Smith for $2,725. Petitioner sold these horses in 1973. [6] Petitioner testified that he had no previous experience with horses but bought these horses at the suggestion of his oldest daughter. He testified that he intended to show the horses and make a profit from showing them as well as from breeding horses and selling their offspring. Petitioner stated that although at least one and perhaps two of the horses were entered at one time in shows, none of the horses were ever shown. He further stated that he attended some horse shows in Fort worth and that some members of his family attended shows in Houston. He testified that he had some of the horses placed with a trainer. The trainer testified that only one horse was ever placed with him for training and that horse was not of show quality. The record does not *406 show any knowledge on the part of petitioner with respect to horses or any past experience in dealing with horses. Petitioner at first testified that none of his family rode the horses, but later stated that one of his sons did at times ride the horses. Section 183 provides that a taxpayer is allowed only certain deductions such as interest and taxes with respect to an activity not engaged in for profit. An activity is engaged in by a taxpayer for a profit only where the taxpayer can show an actual *407 and honest profit objective in engaging in the activity. Although a taxpayer's expectation of profit need not be reasonable, it must be shown that he entered into the activity or continued it with a profit objective. Allen v. Commissioner,72 T.C. 28, 33 (1979), and cases there cited. The determination of whether the requisite profit objective exists is to be based on all the facts of record and the burden is on the taxpayer to show that in fact such an objective existed. Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Greater weight is to be given to objective facts than to mere statements made by the taxpayer. Section 1.183-2(b), Income Tax Regs., lists a number of factors to be considered. Some of these factors are (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in *408 the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements of personal pleasure or recreation. No one factor is controlling. See Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The record here shows that the activities of petitioner with respect to horses was not carried on in a businesslike manner. Petitioner had no prior experience with horses. He never made any profit from the activity. He stated that he had an intention of showing the horses, but he never showed any of them. Although he stated that he had an intention of selling the offspring of the horses, he did not sell any of the foals that the horses bore.In our view, petitioner has totally failed to show that his activity with respect to the horses was an activity which he engaged in for profit. Therefore, he has failed to show that he is entitled to the claimed losses with respect to *409 this activity. The major issues in this case concern the additions to tax. In the case of petitioner, Mrs. Guinn, respondent determined an addition to tax in each year under section 6651(a)(1) for failure to file a return, under section 6653(a) for negligence or intentional disregard of rules and regulations, and an addition to tax under 6654(a) for failure to pay estimated tax. Mrs. Guinn takes the position that she is not liable for the addition to tax under section 6651(a)(1) for failure to file returns or under section 6653(a) for negligence because she relied entirely on her husband to look after all her business affairs. Apparently, Mrs. Guinn contests her liability for the addition to tax under section 6654(a) for failure to pay estimated tax. However, the imposition of this addition to tax is mandatory, and extenuating circumstances, where present, are not a basis for relief. Ruben v. Commissioner,33 T.C. 1071, 1072 (1960). Mrs. Guinn does not argue that one-half of the community income earned by her husband is not her income taxable to her in each of the years here in issue. Clearly, as determined by respondent, Mrs. Guinn must report any community *410 income as her income to the extent of her interest therein whether or not she had dominion and control over her husband's earnings. United States v. Mitchell,403 U.S. 190 (1971). Mrs. Guinn testified at the trial that she relied on her husband, Dr. Guinn, to handle all her financial affairs. She testified that she spent her time being a housewife and rearing the children, and was ignorant of tax laws. The record shows that Mrs. Guinn had finished at least 2 years of college when she and Dr. Guinn were married. It shows that she maintained an interest in her children's schoolwork, that she read newspapers and magazines, and from observation of her, it is clear to the Court that she is an intelligent woman. Although she never specifically stated that she did not know she was required to file a tax return, she clearly intended for that inference to be drawn by the Court. Considering Mrs. Guinn's general intelligence and her demeanor as a witness, we conclude that she knew she was required to file a tax return. She could not have been unaware that Dr. Guinn had income since she paid for household expenses and spent much of the money used by the family for personal *411 living expenses. In fact she stated she was aware that Dr. Guinn had income. She did not testify that she was not aware that under Texas community property law half of his earnings were her income, although she asks the Court to infer that she might have been unaware of this fact. In substance, her testimony was that she relied on her husband to take care of business matters, including filing of tax returns, and assumed no responsibility herself for filing her tax returns. Reliance by a knowledgeable woman on her husband to file a tax return for her is not reasonable cause for failure to file returns. Bagur v. Commissioner,66 T.C. 817, 823-824 (1976), remanded on other grounds 603 F.2d 491 (5th Cir. 1979).
Where the Commissioner has determined that a part of an underpayment of tax is due to negligence within the meaning of section 6653(a), the burden is on the taxpayer to show error in this determination. Rosano v. Commissioner,46 T.C. 681, 688 (1966). *412 Mrs. Guinn, in support of her contention that respondent erred in his determination of addition to tax for negligence, contends that because she relied on her husband to handle all her financial matters, including the filing of tax returns, she should not be held liable for the addition to tax under section 6653(a). The evidence in this record fails to show error in respondent's determination of the addition to tax under section 6653(a). We reiterate that Mrs. Guinn is an intelligent woman and that she was aware that her husband earned substantial income in each of the years here in issue. Bagur v. Commissioner,supra.On this record we hold that respondent properly determined the additions to tax under sections 6651(a)(1) and 6653(a) against Mrs. Guinn for each of the years here in issue. It is not clear whether Dr. Guinn contests the imposition of the addition to his tax under section 6654(a). In any event, as previously pointed out, this addition to tax is applicable regardless of ameliorating circumstances. We therefore sustain respondent's determination of the addition to tax under section 6654(a) against Dr. Guinn. The final issue in this case *413 is whether respondent has shown by clear and convincing evidence that a part of the underpayment of tax by petitioner Dr. Guinn was due to fraud. The record shows that Dr. Guinn filed tax returns for 1958 and 1959. It also shows that he knew that he had sufficient income for the years 1960 through 1972 to be required to file tax returns and pay tax. The record shows that he took his records for the years 1960 to 1965 to an accountant and that for certain years the accountant prepared his tax returns and brought them to him to file. The accountant told petitioner that the returns should be filed. Dr. Guinn claims with respect to certain years, that the returns prepared by the accountant were not complete since he did not have some of the information with respect to his wife's income from certain inheritances. Dr. Guinn claims that his failure to file returns over a 12-year period until investigation of his failure to file was begun by the Internal Revenue Service, was because he did not have the money to pay the tax and he thought that he should not file unless he had the money to pay the tax. He referred to problems his brother, who was a doctor, had when he had filed returns *414 and not paid all the tax shown as due. Dr. Guinn did not explain the problems his brother had, but apparently the problem was that the Internal Revenue Service was attempting to collect the tax owed by his brother. The clear indication from this testimony is that Dr. Guinn did not file returns in order to conceal from the Internal Revenue Service the fact that he had income on which he owed income tax.He concealed his income in an attempt to keep the Internal Revenue Service from collecting tax from him which he knew he owed. The record here does not support Dr. Guinn's contention that he did not have the funds with which to pay the tax. The record shows that his personal expenditures in the years here in issue ranged from $46,000-$67,000 a year. It also shows that he put over $20,000 into a hospital venture, that he bought a home and employed a full-time maid and a part-time gardener. The first year following the years here in issue, he built a swimming pool on his home property. The record also shows that in 1972 Dr. Guinn spent money improving real property his wife had inherited. Dr. Guinn's reply to why he could not have paid his taxes with some of the funds he used for *415 personal living expenses, investment in the hospital, and investment in his wife's property was that he needed to expend the amounts he did on personal living expenses, and that the amount expended in connection with the hospital and his wife's property was in an effort to build up his assets. This was also the explanation he gave with respect to the building of the swimming pool on the 13.74 acres on which his home was located. He stated that he thought the swimming pool would improve the value of the property. Whether an underpayment of tax is fraudulent with intent to evade tax is a factual question. The burden of showing fraud is on the government and fraud must be shown by clear and convincing evidence. As was pointed out by the court in Marsellus v. Commissioner,544 F.2d 883, 885 (5th Cir. 1977), affg. a Memorandum Opinion of this Court, fraud as used in section 6653(b) necessarily implies some intentional misconduct, and while the failure to file returns over a long *416 period of time is not conclusive of such wrongdoing, this failure is persuasive circumstantial evidence of fraud. Petitioner relies primarily on Jones v. Commissioner,259 F.2d 300 (5th Cir. 1958), reversing in part 25 T.C. 1100 (1956). As we read that case, it does not hold that the deliberate failure of a taxpayer to file income tax returns because he desired to use money which he owed for income taxes for personal purposes is not indicative of fraud. The court in Jones v. Commissioner,supra, discussed at some length the distinction between willful failure to file returns and fraud and concluded that in order to establish fraud the government must show, in addition to willful failure to file, some independent act of misrepresentation or concealment on the part of the taxpayer. In our view, respondent in this case has made the additional required showing. Petitioner in the instant case had substantial income in each of the years 1960 through 1972. He did not file returns over this period of 12 years even though his accountants had informed him of the necessity of filing the returns and one accountant had suggested *417 to him that the failure to file was fraudulent.Our interpretation of petitioner's testimony about his knowledge of his brother's problems with the Internal Revenue Service is that petitioner believed that if he filed returns showing the income tax he computed that he owed, respondent would collect that tax from him and he then might be unable to spend the money on personal living expenses and investments. In substance, petitioner testified that he did not file returns because he wanted to keep the money for his personal use and in effect conceal from the government the fact that he owed taxes.This, in our opinion, is strong evidence of petitioner's intent to evade the taxes he knew to be due and owing. We have not overlooked the fact that petitioner testified that he did not intend to evade his taxes but at some time when he thought he had sufficient funds available, to pay these taxes. We do not believe this testimony. The objective evidence clearly establishes this testimony to be untrue. Petitioner spent substantial sums on personal expenses and invested in real property and in a hospital while making no payments whatsoever with respect to his taxes and concealing the fact *418 that he owed the taxes by not filing tax returns. Petitioner points to many circumstances in the instant case which he says are comparable to the circumstances in the Jones case. When the revenue agents began to investigate petitioner's tax liability, he furnished them the computer records on which he kept his medical practice income and disbursements and also with his bank statements from which respondent's agents were able to reconstruct the gross receipts of the pharmacy and other records from which they were able to reconstruct pharmacy expenses. Once respondent began an investigation of petitioner's tax liability, there is no evidence of concealment of facts by petitioner. We do not conclude from these actions by petitioner that he was not attempting to evade taxes he knew he owed by concealing the fact that he owed taxes. Rather, we conclude that when respondent discovered petitioner's failure to file returns or pay taxes over a 12-year period, petitioner considered it to be advantageous to him to supply respondent with his records to establish his deductible expenses. There were other sources available to respondent from which to compute petitioner's income. The *419 record shows that petitioner received substantial payments from Medicare and Medicaid. Also, respondent could have obtained petitioner's bank records had they not been furnished to his agents by petitioner. Under the facts here present, petitioner's cooperation with respondent's agents after his failure to file returns and pay taxes over a 12-year period was discovered is not indicative that underpayments were not due in part to fraud. [7]
In Marsellus v. Commissioner,supra, the court found that the taxpayer committed an independent act of concealment when he deposited his funds solely in noninterest-bearing accounts so as to conceal his income from the government. Here, petitioner attempted to conceal his income by not filing returns. The court pointed out in the Marsellus case that the taxpayer's claim that his failure to file returns for later years was motivated by a fear that his previous failure to file would be detected, established that his intent was to conceal his income and his tax liability from the government. Petitioner's claim that he did not file his returns *420 because of not having money available to pay his taxes, when the record clearly establishes to the contrary, is in our view likewise a clear indication of intent to conceal his income and the fact that he owed taxes. We recognize that mere failure to believe the testimony of a taxpayer does not discharge respondent's burden of proof. In this case, however, the clear inference from the evidence as a whole in that a part of the underpayment of taxes by petitioner in each of the years here in issue was due to fraud. From the evidence as a whole, we conclude that it was petitioner's intent never to pay taxes for the years here in issue and that he would not have made any payments with respect to these taxes had not this failure to file his returns been discovered by respondent. In drawing the conclusion we have drawn, we have not overlooked the fact that petitioner did render valuable service to his community in a civic capacity as well as through the practice of his profession. Petitioner stated that much of his work was charity work, but this statement is not supported by the record. Petitioner's records show collections of 80 percent to 90 percent of his billings, with a substantial *421 portion of these collections being through Medicare and Medicaid payments. The record also shows petitioner had income from his pharmacy. Petitioner's net income from his medical practice ranged from approximately $35,000 to approximately $68,000 during the years here in issue, and his net income from the pharmacy ranged from $2,000 to $3,000 a year. On the basis of the evidence as a whole, we sustain respondent's determination of additions to tax under section 6653(b) against Dr. Guinn for each of the years here in issue. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. The parties at the trial stipulated the amount of petitioner Edward W. Guinn's gross income, both from his medical practice and from his operation of a pharmacy. The gross income from petitioner's medical practice was computed from books and records kept by petitioner in his medical office, and the gross receipts from the operation of the pharmacy were compiled from a summary of bank deposits with certain adjustments. The parties also stipulated that petitioner's expenses from his medical practice were not less than the amounts for each of the years in issue than the amounts determined by respondent, and that petitioner's expenses and deductions in the operation of the pharmacy were not less for each of the years in issue than the amounts determined by respondent. Petitioners contend that they are entitled to deduct business expenses and certain other expenses incurred and paid in each year in issue in addition to those to which respondent agrees.↩
3. In the statutory notice of deficiencies, respondent utilized petitioner's computer prepared records to compute petitioner's gross income for the years 1968 through 1972 from petitioner's medical practice, and petitioner has agreed to the gross income amount as determined by respondent.↩
4. Because of the above-recited facts which were brought out at the trial, respondent has conceded that Dr. Guinn suffered a nonbusiness loss in 1966 in the amount of $20,358.89, the face amount of the note, but denies that the loss is a loss in any year after 1966 when the hospital ceased operation.↩
6. Although respondent does not make any argument on this basis, it is difficult to see how petitioner could have sustained a loss of $5,551.30 from horses or activities with respect to horses in 1971 when he did not buy the horses until almost the end of that year. However, respondent makes no contention about the amount petitioner claims as a loss on the "horse business," but merely contends that petitioner's activities with respect to the horses was not an activity engaged in for profit. For this reason we do not need to address how petitioner arrived at the $5,551.30 claimed loss.↩
7. See Suttie v. Commissioner,T.C. Memo. 1983-358↩.