DENNIS J. SEIDENFELD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Seidenfeld v. Commissioner
Docket No. 19345-92
United States Tax Court
T.C. Memo 1995-61; 1995 Tax Ct. Memo LEXIS 62; 69 T.C.M. (CCH) 1848; T.C.M. (RIA) 95061; February 6, 1995, Filed *62 Decision will be entered under Rule 155. Dennis J. Seidenfeld, pro se. For respondent: Guy H. Glaser. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes: Additions to Tax Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1983
$  6,230
$  3,115
[1] $  1,558
1984
39,074
19,537
[1] 9,769
1985
44,581
22,291
[1] 11,145
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded. After concessions, [1] the issues for decision are: (1) Whether petitioner understated his income during each of the years in issue; (2) whether petitioner is entitled to unreimbursed business expense deductions for all the years in issue in excess of the amounts allowed by respondent; (3) whether petitioner is entitled to a loss deduction in any of the years in issue for a fire that occurred in 1980, and if so, the year in *63 which the loss is allowed and the amount of such loss; (4) whether petitioner is liable for additions to tax for fraud pursuant to section 6653(b)(1) and (2); and (5) whether petitioner is liable for additions to tax for substantial understatement of income tax pursuant to section 6661. *64 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Irvine, California, at the time he filed his petition in this case. He graduated from State University of Iowa where he majored in political science and sociology. Petitioner timely filed joint Federal income tax returns with his wife, DeVorah Seidenfeld, [2] for each of the years in issue. They resided in Des Moines, Iowa. Their tax returns were prepared by Willis Savage (Savage). In the notice of deficiency, respondent determined that for each of the years in issue petitioner intentionally omitted income from various sources with the intent to evade taxes. First, respondent determined that petitioner diverted *65 corporate income for his personal use (dividend income) for each of the years in issue without reporting this income on his individual tax returns as follows: Year
Amount
1983
$ 16,298
1984
68,381
1985
32,830
In addition, respondent determined from cash bank deposits that petitioner had unreported income derived from unidentified sources for each of the years in issue as follows: Year
Amount
1983
$ 12,528
1984
46,283
1985
63,887
At trial, respondent produced evidence that during the years in issue petitioner received dividend income and made cash deposits from unidentified sources as follows: Dividend
Cash Deposits from
Year
Income
Unidentified Sources
1983
$ 15,368
$ 12,929
1984
64,057
41,191
1985
32,775
50,696
Respondent did not amend her answer to conform to the evidence. Petitioner contested the inclusion of any of the cash deposits in his income. Thus, for 1983, the amount of cash deposits from unidentified sources at issue remains $ 12,528 (the amount determined in the notice of deficiency), rather than $ 12,929. In her posttrial brief, respondent accepts the lesser amounts for the cash deposits from unidentified sources for *66 1984 and 1985. Accordingly, the amounts of cash deposits from unidentified sources at issue are as follows: Cash Deposits from
Year
Unidentified Sources
1983
$ 12,528
1984
41,191
1985
50,696
Finally, respondent determined that for 1985, petitioner failed to report $ 14,000 of the $ 20,000 proceeds he received from a disability insurance policy, and $ 10,000 of the proceeds he received from a business interruption insurance policy. During the years in issue, petitioner and his brother, Edward Seidenfeld (Edward), each owned a 50-percent interest in, and operated, four corporations: Automotive Wholesale, Inc. (AW), Central Midwest Wreckers, Inc. (CMW), North Central States Conference Lines, Inc. (NCSCL), and Road Runner. AW, CMW, and NCSCL were Iowa corporations. The record is silent as to the State in which Road Runner was incorporated. AW was engaged in the business of selling new, used, and rebuilt automotive parts in the Des Moines area. Both CMW and NCSCL were engaged in the business of providing a telephone long-line communication service used to locate automotive parts for automotive parts stores and salvage yards in an 11-State area. Road Runner delivered *67 the automotive parts to persons that used the services of CMW and NCSCL. Road Runner also delivered auto parts sold by AW. Petitioner was president of CMW and NCSCL, and vice president of AW. Edward served as president and treasurer of AW and vice president of CMW and NCSCL. Petitioner was responsible for purchasing AW's merchandise. Edward was responsible for the recordkeeping of AW, CMW, and NCSCL. Petitioner was primarily responsible for Road Runner's operations. Petitioner was considered the "outside man" and Edward the "inside man" for the corporations. Savage was the accountant for AW, CMW, and NCSCL. We will hereinafter discuss each corporation separately. AW
AW sold a wide range of automotive merchandise, including hubcaps, T-tops, starters, alternators, front ends, rear clips, and doors. AW sold to both retail and wholesale customers. Retail customers came in "off the street" to buy merchandise. They paid for merchandise at the time of purchase by cash, check, or credit card. Wholesale customers, such as body shops, automotive parts shops, and automotive dealers, paid for merchandise by cash, check, or credit card, or "on account". With respect to AW's *68 cash, check, or credit card sales, Edward would post the amount of the sales receipts to the Daily Sales and Cash Report (Report). When a sale was made "on account", Edward would draw up an invoice and attach it to a ledger card. When a payment was made on the account, Edward would make a notation on the ledger card. Edward used the ledger cards to determine "cash received on account" and "charges". He recorded both of these items on the Report. Edward then prepared a bank deposit slip and deposited the money received into the bank. Edward did not report all sales made. He diverted some of the checks and cash received from AW's customers by depositing the checks into his or petitioner's personal bank accounts or negotiating the checks for cash. Edward concealed the transactions by either not preparing ledger cards or not recording receipt of the checks on the ledger cards. On numerous occasions during the years in issue, petitioner individually endorsed checks received from AW's customers and deposited them into his personal bank accounts or negotiated the checks for cash. The amounts so diverted from AW for the years in issue were as follows: Year
Amount
1983
$  5,843
1984
28,897
1985
6,905
*69 Savage prepared AW's corporate returns using the Reports Edward supplied. When sales proceeds were not recorded on the Report, Savage did not report them on AW's tax return. Petitioner did not report the diverted amounts on his individual tax returns. AW never declared or paid any dividends. AW had earnings and profits in excess of the amounts diverted by petitioner and Edward for each of the years in issue. CMW and NCSCL
As president of CMW and NCSCL, petitioner traveled throughout the midwestern United States soliciting subscribers for CMW's and NCSCL's telephone line service. Edward, with the help of Savage, was responsible for the recordkeeping of CMW and NCSCL. Edward's duties as bookkeeper of CMW and NCSCL were essentially the same as his duties for AW. Only petitioner and Edward had authority to write checks on CMW's and NCSCL's corporate accounts. CMW and NCSCL customers were required to pay in cash or by personal check. Customers would either mail in their subscription fees or personally deliver them to petitioner during his travels throughout the midwestern United States. When petitioner or Edward received checks from customers, they endorsed them and *70 frequently deposited them into one of their personal bank accounts or negotiated them for cash. When CMW or NCSCL made a sale, Edward usually recorded the sale proceeds on CMW's or NCSCL's income ledger. However, when petitioner or Edward received a check that they deposited into one of their personal bank accounts or negotiated for cash, Edward did not record the sale proceeds represented by the check on CMW's or NCSCL's income ledgers. The amounts so diverted by petitioner from CMW and NCSCL for the years in issue were as follows: Amount
Year
CMW NCSCL 1983
$   9,475
$   50
1984
25,360
9,800
1985
22,850
3,000
Savage prepared the corporate returns for CMW and NCSCL using the income ledgers provided by Edward. Because the diverted checks were not recorded in CMW's or NCSCL's income ledgers, Savage did not report these funds on CMW's or NCSCL's corporate returns, and these amounts were not included in either corporation's income. Neither petitioner nor Edward reported the diverted amounts on his individual tax returns. CMW and NCSCL never declared or paid any dividends. Both corporations had earnings and profits in excess of the amounts diverted by petitioner *71 and Edward. Road Runner
During the years in issue, Road Runner was an automotive parts pickup and delivery service that worked in conjunction with AW, CMW, and NCSCL. Drivers for Road Runner, referred to as "roadrunners", made between 1 and 10 deliveries per dispatch. Depending upon the size of the item, the cost of delivery ranged from $ 25 to $ 100 for each item delivered or picked up. Petitioner was primarily responsible for Road Runner's operations. He did not keep any books or records detailing the revenues and expenses Road Runner incurred during the years in issue. Customers paid for Road Runner's services either in cash or by issuing checks payable to petitioner, AW, CMW, or Road Runner. On occasion, petitioner and Edward endorsed and diverted customer checks from Road Runner into their respective personal bank accounts or negotiated the checks for cash. During 1983 and 1984, petitioner deposited $ 250 and $ 1,834, respectively, in checks made payable to Road Runner into his personal bank accounts. Petitioner did not report these amounts on the joint Federal income tax returns he filed with his wife. Cash Deposits
During the years in issue, petitioner *72 made deposits of $ 104,816 from unexplained sources into several personal and joint bank accounts that he and his wife maintained as follows: Brenton Hawkeye Bankers Year
Bank
Bank
Trust Total 1983
$  7,695
$  5,234
--   $ 12,929
1984
18,414
22,777
--   41,191
1985
14,600
8,717
$ 27,379
50,696
These deposits were not reported as income on the joint Federal income tax returns petitioner filed with his wife for these years. Insurance Disability Benefits
In December 1984, petitioner sustained a back injury while playing volleyball. In March 1985, petitioner filed a claim with Monarch Life Insurance Co. (MLI) for disability payments under a policy issued by that company, the premiums of which were paid by AW. During 1985, petitioner received a total of $ 20,000 in disability benefits under the terms of the policy. Petitioner provided Savage with the MLI check stub, which reflected the $ 20,000 in disability benefits payments. Petitioner did not report any of the disability payments on his Federal income tax return for 1985. Business Interruption Insurance Proceeds
In 1980, petitioner began Automotive Wholesale Distributors (AWD). *73 AWD was to sell new, used, and rebuilt automotive parts. On July 16, 1980, petitioner entered into an installment contract to purchase a store and warehouse in Des Moines, Iowa, from Bill B. Couch (Couch) for $ 215,000. Included in the sale price was $ 130,000 worth of automotive parts. Petitioner gave Couch a $ 30,000 down payment, and agreed to pay the remaining $ 185,000, plus interest, in monthly installments. Couch assigned his rights under the contract to Valley National Bank (VNB). Petitioner entered into a consignment agreement with Bill Ramsey, d.b.a. World Parts International (Ramsey), to acquire additional inventory for AWD. On June 30, 1980, A.I.U. Insurance Co. (AIU) issued a property owner's policy to petitioner, d.b.a. AWD. This policy insured petitioner against, among other things, fire and related damage. The policy named Ramsey as loss payee, and VNB as mortgagee. On August 21, 1980, before AWD had begun operating as a business, a fire damaged the store, warehouse, and some of the merchandise stored therein. Petitioner filed a claim with AIU for damage to the store, warehouse, and inventory, and for loss of related earnings. AIU refused to pay the claim, *74 alleging that the fire was the result of an intentional act of petitioner or someone under his control. On April 13, 1981, AIU filed a Complaint for Declaratory Judgment in the Central Division of the U.S. District Court for the Southern District of Iowa requesting that the court determine the rights and liabilities of the parties with respect to the property owner's policy issued by AIU to petitioner, d.b.a. AWD, and to declare that said policy of insurance "provides no coverage for the fire of August 21, 1980". On April 20, 1981, petitioner retained counsel to represent him. Thereafter, petitioner, Ramsey, and VNB filed a counterclaim against AIU seeking damages for the building and inventory, and for lost earnings. On July 29, 1983, petitioner, d.b.a. AWD, was awarded $ 30,000, plus interest, for lost earnings. In addition, petitioner, d.b.a. AWD, and Ramsey were jointly awarded $ 31,807, plus interest. Further, petitioner, d.b.a. AWD, and VNB were jointly awarded $ 59,622, plus interest. On September 20, 1984, petitioner and VNB entered into an agreement to settle the amounts due each of them from the award granted by the court. VNB agreed to pay petitioner $ 10,000 and *75 to release him from all obligations that arose from the contract that Couch had assigned to VNB. In exchange, petitioner relinquished all claims to the proceeds of the joint judgment and agreed to transfer his interest in the damaged store and warehouse to VNB. VNB tendered a check for $ 10,000 to petitioner's attorney, and petitioner's attorney held that amount in trust for petitioner. On January 29, 1985, the District Court ordered that the sum of $ 42,513 (representing the $ 30,000 loss of earnings award, plus interest) be released to petitioner. On February 12, 1985, petitioner received a check for $ 10,000 from his attorney, representing the portion of the $ 42,513 due petitioner after various expenses were deducted. Petitioner deposited the check into his personal bank account. Petitioner neither informed Savage that he had received this money nor reported the money on his 1985 Federal income tax return. As of February 1985, Ramsey and petitioner had not resolved the amount each would receive from their joint judgment. Fire Loss
At trial, the Court, sua sponte, raised the issue of whether petitioner was entitled to a loss during the years in issue as a result *76 of the aforementioned fire damage. Based on documents presented at trial, we find that petitioner sustained a $ 20,000 loss in 1984, computed as follows: Investment (market value)
$ 215,000 in store, warehouse, and
merchandise inventory
Less: Discharge of debt
(185,000)
Proceeds from VNB
( 10,000)
$  20,000 Petitioner did not report this loss on any of the joint Federal income tax returns he filed with his wife for any of the years in issue. Unreimbursed Business Expenses
Petitioner made frequent trips for AW, CMW, and NCSCL, but did not deduct any business expenses from these trips on his tax returns for any of the years in issue. Respondent, in the notice of deficiency, allowed petitioner deductions of $ 2,000 for unreimbursed business expenses for each of the years in issue. Petitioner introduced seven canceled checks made payable to United Airlines. Three of the checks, totaling approximately $ 420, apply to 1983. The remaining checks, totaling approximately $ 1,487, pertain to 1985. Petitioner presented no evidence with regard to 1984. Criminal Investigation of Petitioner
In September 1986, the Internal Revenue Service (IRS) began a *77 criminal investigation of petitioner. Special Agent Howard Stoffa (Stoffa) informed petitioner in November 1986 that his tax returns for the years in issue were under criminal investigation. When questioned by Stoffa about his occupation, petitioner responded that he was president of CMW and vice president of AW, but did not mention his ownership of NCSCL or Road Runner. Petitioner denied ownership of any other business operations, and did not inform Stoffa that he owned or had operated the pizza restaurant and Dairy Queen franchise operation. Petitioner told Stoffa that he did not own any certificates of deposit. On further investigation, however, Stoffa discovered over $ 100,000 in certificates of deposit in the names of petitioner, Edward, and their mother. Petitioner told Stoffa that he did not recall receiving any gifts during the years in issue. He stated that he had not received any damage awards from legal actions. Finally, petitioner stated that he had not received any loans from friends or relatives during the years in issue. Stoffa later contacted petitioner to determine the status of bank records Stoffa had requested. Petitioner referred Stoffa to his attorneys. *78 They furnished Stoffa with an incomplete set of records. Stoffa obtained the remaining records from petitioner's banks. From these records, Stoffa learned of the existence of NCSCL and Road Runner. From his analysis of petitioner's bank records, Stoffa discovered that a substantial number of third-party checks had been deposited into petitioner's accounts. Through a questionnaire, Stoffa contacted the third-party payers. In response to Stoffa's questionnaire, these payers described their business activities with AW, CMW, NCSCL, and Road Runner, and provided Stoffa with copies of their canceled checks. Stoffa compared these checks with the corporate books of AW, CMW, NCSCL, and Road Runner, and determined that none of the checks had been reported on the corporate books. In March 1990, the U.S. Department of Justice charged petitioner and Edward, in violation of 18 U.S.C. sec. 371, with conspiracy to commit offenses or to defraud the United States in diverting corporate receipts from AW, CMW, NCSCL, and Road Runner totaling approximately $ 282,000, and concealing the diversion of these receipts from the IRS for the period January 1, 1983, *79 through March 6, 1986. On March 13, 1990, both petitioner and Edward pled guilty to conspiring to commit offenses or to defraud the United States in violation of 18 U.S.C. sec. 371. At the time of the plea, an agreed statement of facts was filed, in which petitioner admitted, in pertinent part, the following: 7. On or about January 1, 1983, Dennis Seidenfeld and Edward Seidenfeld entered into an agreement with each other to defraud the United States by impairing, impeding and obstructing the Internal Revenue Service in the exercise of its lawful functions. Specifically, Dennis Seidenfeld agreed with Edward Seidenfeld to divert corporate receipts which totalled approximately $ 282, 000 from Central Midwest, North Central States, Automotive Wholesale and Road Runner, and to conceal the diversion of these receipts from the Internal Revenue Service. 8. The scheme to defraud operated as follows: (a) Checks issued by customers of either Central Midwest, North Central States, Automotive Wholesale or Road Runner, as payment for goods or services provided to these customers were taken by either Dennis Seidenfeld or Edward Seidenfeld and either *80 deposited into a personal bank account or converted to cash. (b) The funds diverted in this manner were used by Dennis Seidenfeld and Edward Seidenfeld principally for personal expenses and otherwise commingled with other personal monies. (c) Neither Dennis Seidenfeld nor Edward Seidenfeld reported the diverted funds to their return preparer, causing these amounts to be omitted from each of their federal individual income tax returns (Forms 1040) for the years 1983, 1984 and 1985. (d) Dennis Seidenfeld and Edward Seidenfeld agreed not to record the diverted receipts on the income ledgers from Central Midwest and North Central States for the calendar years 1983, 1984 and 1985. Accordingly, the diverted receipts were not so recorded. (e) Dennis Seidenfeld and Edward Seidenfeld agreed to and, in fact, did provide these income ledgers to the corporations' return preparer, knowing the income ledgers omitted substantial corporate receipts.
9. Dennis Seidenfeld committed a fraud on the Internal Revenue Service in the following manner: (a) Dennis Seidenfeld knowingly aided and assisted in the preparation and filing of false federal corporate income tax returns on behalf of Central *81 Midwest for the years 1983, 1984 and 1985. These returns were false because they did not report the income diverted from Central Midwest by Dennis Seidenfeld and Edward Seidenfeld. (b) Dennis Seidenfeld knowingly aided and assisted in the preparation and filing of false federal corporate income tax returns on behalf of North Central States for the years 1983, 1984 and 1985. These returns were false because they did not report the income diverted from North Central States by Dennis Seidenfeld and Edward Seidenfeld. (c) Dennis Seidenfeld knowingly signed and caused to be filed false federal individual income tax returns for the years 1983, 1984 and 1985. These returns were false because Dennis Seidenfeld did not report or cause to be reported approximately $ 103,000, which he diverted from Central Midwest, North Central States, Automotive Wholesale and Road Runner. (d) On numerous occasions Dennis Seidenfeld individually endorsed customer checks issued to Central Midwest, North Central States, Automotive Wholesale, and Road Runner as payment for goods and/or services, and deposited these checks into his personal bank account or negotiated the checks for cash.
Petitioner *82 was sentenced to a year's imprisonment and served approximately 3-1/2 months. ULTIMATE FINDINGS OF FACT 1. During the years 1983, 1984, and 1985, petitioner diverted to himself, and used for personal purposes, $ 15,368, $ 64,057, and $ 32,755, respectively, from the incomes of CMW, NCSCL, and AW. 2. The diverted income represents taxable income to petitioner for the years 1983, 1984, and 1985. 3. The diverted income was not reported on petitioner's joint Federal income tax returns for the years 1983, 1984, and 1985. 4. The cash deposits of $ 12,528, $ 41,191, and $ 50,696, that petitioner made into his personal checking accounts during the years 1983, 1984, and 1985, respectively, represent taxable income to him for the respective years. 5. The cash deposits were not reported on petitioner's joint Federal income tax returns for the years 1983, 1984, and 1985. 6. Except for the understatement of tax with respect to the $ 20,000 insurance disability benefits which petitioner received in 1985, all the understatements of tax required to be shown on petitioner's joint Federal income tax returns for the years 1983, 1984, and 1985 are due to fraud. OPINION Issue 1. Petitioner *83 Failed To Report Dividend and Cash Deposit Income
The Commissioner has broad discretion to determine whether the taxpayer's accounting method clearly reflects income. Commissioner v. Hansen, 360 U.S. 446, 467 (1959). If the taxpayer's accounting method does not clearly reflect income, the Commissioner may recompute income using any method which she determines will clearly reflect income. Sec. 446; Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965). The reasonableness of the reconstruction is considered in light of the surrounding facts and circumstances. Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989). Once the Commissioner has linked the taxpayer to an income-producing activity, the burden of proving that the Commissioner's determination is erroneous, arbitrary, or otherwise invalid rests on the taxpayer. Resyn Corp. v. United States, 851 F.2d 660, 663 (3d Cir. 1988); Adamson v. Commissioner, 745 F.2d 541 (9th Cir. 1980), affg. T.C. Memo. 1982-371; Edwards v. Commissioner, 680 F.2d 1268 (9th Cir. 1982), *84 affg. T.C. Memo. 1982-371. In the instant case, respondent contends that the joint returns petitioner filed for the years in issue do not accurately reflect petitioner's income for those years. Respondent used the specific item method and bank deposits method to determine petitioner's gross income. Each of these methods will be addressed in turn. Specific Item Method
The specific item method is "'direct in its operation. The usual strategy . . . is for the Government to produce evidence of the receipt of specific items of reportable income by the * * * [taxpayer] that do not appear on his income tax return or appear in diminished amount.'" United States v. Marabelles, 724 F.2d 1374, 1377 n.1 (9th Cir. 1984) (quoting United States v. Horton, 526 F.2d 884, 886 (5th Cir. 1976)). In the instant case, respondent determined the amount of income petitioner received by obtaining canceled checks from third parties made payable to AW, CMW, NCSCL, and Road Runner. Respondent compared those amounts to the books and records of the corporations as well as to petitioner's personal bank records. *85 Respondent thereafter determined that petitioner received $ 15,368, $ 64,057, and $ 32,775 of income in this manner for 1983, 1984, and 1985, respectively. Respondent demonstrated that petitioner diverted checks written to AW, CMW, NCSCL, and Road Runner into his personal bank accounts or negotiated checks for cash. Petitioner was a major shareholder and officer of all four corporations and maintained check-cashing authority with all of them. Respondent determined that each corporation had enough earnings and profits to cover the amounts diverted by petitioner. Accordingly, respondent characterized the diverted funds as dividends. Secs. 301(c), 316. We find respondent's characterization of the diverted funds as dividends persuasive. Courts have consistently ruled that funds diverted by controlling stockholders should be characterized as dividends. United States v. Harvey, 996 F.2d 919, 920 (7th Cir. 1993); Rubber Associates v. Commissioner, 335 F.2d 75, 78 (6th Cir. 1964); United States v. Stonehill, 420 F. Supp. 46, 62 (C.D. Cal. 1976), aff'd. in part and revd. in part 702 F.2d 1288 (9th Cir. 1983). *86 The dividend does not have to be formally declared to be treated as a dividend-in-fact. Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84. Intent of the parties is not decisive. Id. at 443. As long as the evidence indicates that the distribution was made "under a claim of right or without any expectation of repayment", it may properly be characterized as a dividend. Id.
Respondent contends that petitioner used for personal purposes checks tendered to the relevant corporations; he deposited the checks into his personal bank accounts or cashed them. Petitioner asserts that he cashed the checks from the various corporations and used the proceeds to buy merchandise for AW. Petitioner's claim is contradictory to admissions he made during his criminal tax prosecution that he diverted corporate receipts from CMW, NCSCL, and AW during the years in issue for his own personal use. Further, the record does not show how much, if any, of the diverted funds was used to purchase inventory. We considered each of petitioner's claims and assertions. Some were intended *87 to invoke the Court's sympathy but were not relevant. Others were relevant but were without support in the record. Because petitioner had the unfettered right to use all the diverted funds in any manner he desired, we sustain respondent's amended determinations made under the specific item method. Bank Deposits Method
"The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income." DiLeo v. Commissioner, 96 T. C. 858, 868 (1991), affd. 952 F.2d 16 (2d Cir. 1992); Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). Bank deposits are prima facie evidence of income, and respondent does not need to show a likely source of the income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). For the years in issue, respondent determined income to petitioner of approximately $ 104,800, using the bank deposits method. Respondent determined petitioner's income by subtracting from the total deposits all salary and disability payments, all diverted funds that were deposited, and all deposits *88 from the pizza restaurant and Dairy Queen franchise operation. Where respondent could trace the deposit item directly to its source, e.g., the canceled check, respondent did so. However, where the deposit items were unavailable, respondent used the bank deposits method to make her determination. We agree with respondent's determination. Petitioner offered explanations as to three sources for the deposits: (1) They were gifts from his mother; (2) some of the funds were credit card advances; and (3) some of the funds were personal loans made to him by friends and acquaintances. We will address each of these explanations in turn. Petitioner contends that, in part, the bank deposits were gifts from his mother. But in petitioner's interview with Stoffa, petitioner stated that he did not recall receiving any gifts during the years in issue. Petitioner later told Stoffa that he had received between $ 7,000 and $ 10,000 in cash as gifts during each of the years in issue. At trial, petitioner testified that his mother gave him at least $ 20,000 to $ 25,000 per year. He further testified that he lied to prevent Stoffa from interviewing his mother, who was ill at the time and died *89 several months thereafter. However, when questioned by the Court, petitioner admitted that the amounts varied, and that the amounts increased after his mother discovered she had cancer in 1985. Petitioner testified that his mother could make the gifts because of the large estate petitioner's father left her. Petitioner's father, Theodore S. Seidenfeld, died in 1976; his estate was worth approximately $ 125,000, with a substantial portion of the assets tied up in real estate and other investments. In May 1985, his father's real estate was sold for $ 200,000, but most of the proceeds were invested in two certificates of deposit or were used to pay petitioner's mother's personal income taxes for that year. After accounting for these expenditures, we do not believe petitioner's mother possessed sufficient remaining resources to make gifts to petitioner of $ 25,000 per year. Further, Savage, who prepared petitioner's mother's tax returns, testified that he did not know of any cash gifts made by petitioner's mother to petitioner, nor did Savage prepare any gift tax returns for petitioner's mother for the years in issue. We found petitioner's testimony to be less than completely truthful. *90 While we can accept petitioner's assertion that his mother gave him cash gifts on occasion, we do not believe that any part of the unexplained deposits came from his mother. [3]
Petitioner next contends that some of the deposits came from credit card advances. He stated that he had documentation with him at trial to prove this contention. But he never presented that evidence to respondent or to the Court. Finally, petitioner claims that two of the deposits came from loans made by friends and acquaintances. He claims that a $ 5,000 check issued by First Midwest Corp. represents a loan to him from Harry Pomerantz *91 (Pomerantz). But the evidence indicates that the Pomerantz loan was made to AW, not petitioner. Furthermore, we are mindful that the loan was collateralized by a car, title to which was returned to AW when AW repaid the Pomerantz loan. The second of the deposits that petitioner claims came from loans by friends and acquaintances involves money from Northern Auto Parts. Petitioner claims that Northern Auto Parts made a $ 5,000 loan to him. Petitioner's bank deposits for 1983-85 fail to reflect the deposit of the alleged Northern Auto Parts check. The only substantiation petitioner provided, other than his own testimony, was a check from petitioner to Northern Auto Parts, dated January 13, 1985. Petitioner asserts that this check represents his repayment of the loan. As stated, we did not find petitioner's testimony completely credible. Moreover, his testimony about this and the other alleged loans contradicts his statement to Stoffa during an interview held on November 7, 1986, wherein petitioner informed Stoffa that he had not received any loans from friends or relatives for the years in issue. Accordingly, we sustain respondent's determinations of petitioner's income under *92 the bank deposits method. Disability Payments
Petitioner received $ 20,000 in disability payments from MLI during 1985 for a back injury suffered in 1984. Respondent, in the notice of deficiency, determined that petitioner had failed to report $ 14,000 of these payments. In her posttrial brief, respondent claims that she "mistook" as being part of the $ 20,000 payments, $ 6,000 in other Form W-2 compensation. Thus, respondent now asserts that petitioner's 1985 income should be increased by the full $ 20,000. Respondent failed to amend her answer to conform to the evidence adduced at trial. Section 105(a) includes in gross income "amounts received by an employee through accident or health insurance for personal injuries or sickness * * * to the extent such amounts * * * are paid by the employer". Benefits received from premiums paid by the employer are subject to the provisions of section 105(a). Sec. 1.105-1(b), Income Tax Regs. AW paid the premiums for petitioner's disability insurance. Petitioner was an officer of AW and functioned as an employee. Thus, the provisions of section 105(a) are satisfied. Section 105(c) is an exception to section 105(a). Section 105(c) *93 excludes from income amounts that are payments for permanent loss or disfigurement that are not computed with regard to the period the employee is absent from work. Petitioner has not shown that the money he received was for permanent loss of the use of his back or that it was not measured by the amount of time he was absent from work. Accordingly, petitioner should have reported in income the $ 20,000 in medical disability benefits he received in 1985. But because respondent did not amend her answer to conform to the evidence, as she could have done pursuant to Rule 41(b), we sustain respondent's determination in this regard only to the extent set forth in the notice of deficiency (namely, $ 14,000). Business Interruption Insurance Proceeds
On February 12, 1985, petitioner received a check for $ 10,000 from his attorney, representing the portion of an award for lost earnings, plus interest, remaining after various expenses were deducted. Petitioner deposited this check into his personal bank account. It is well settled that proceeds from a business interruption policy, which compensates for lost profits or earnings, are taxable as ordinary income to the recipient. Massillon-Cleveland-Akron Sign Co. v. Commissioner, 15 T.C. 79 (1950). *94 Accordingly, petitioner should have reported in his 1985 income the aforementioned $ 10,000 he received from his attorney. Issue 2. Petitioner Is Entitled To Deduct Unreimbursed Employee Business Expenses Only to the Extent Allowed by Respondent Pursuant to Section 162(a)(2)
Section 162(a)(2) allows a taxpayer to deduct all ordinary and necessary expenses incurred in carrying on any trade or business, including traveling expenses while away from home in the pursuit of a trade or business. Petitioner made frequent trips for AW, CMW, and NCSCL, but did not deduct any business expenses from these trips on his tax returns for any of the years in issue. Respondent, in the notice of deficiency, allowed petitioner deductions of $ 2,000 for unreimbursed business expenses for each of the years in issue. Petitioner introduced seven canceled checks made payable to United Airlines. Three of the checks, totaling approximately $ 420, pertain to 1983. The remaining checks, totaling approximately $ 1,487, pertain to 1985. Petitioner asserts that these checks represent unreimbursed employee business expenses he incurred. He presented no evidence with regard to 1984. Petitioner presented *95 no other evidence as to the amount of his unreimbursed employee business expenses. The amount of checks presented by petitioner is less than the $ 2,000 allowed by respondent. Accordingly, we hold that petitioner is entitled to unreimbursed employee business expense deductions only to the extent allowed by respondent. Issue 3. Petitioner Is Entitled to a Loss for the 1980 Fire to His Automotive Parts Business
Section 165(a) allows a deduction for "any loss sustained during the taxable years and not compensated for by insurance or otherwise". In her posttrial brief, respondent concedes that petitioner sustained a loss as a result of the fire to his automotive parts business (AWD) in 1980. Thus, the only questions before us are the year in which the loss is allowed and the amount of such loss. For the deduction to be allowed under section 165(a), "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, * * * actually sustained during the taxable year". Sec. 1.165-1(b), Income Tax Regs. Where a casualty loss is covered by insurance, the deduction normally is not allowed until the year the compensation claim is settled. Allied Furriers Corp. v. Commissioner, 24 B.T.A. 457, 459 (1931). *96 Until 1984, all compensation claims had not been resolved. Thus, 1984 is the year in which the loss is allowed. The amount of the deduction for the fire loss is the lesser of (1) the fair market value of the property immediately before the casualty decreased by the fair market value of the property immediately after the casualty, or (2) the adjusted basis. Sec. 1.165-7(b)(1), Income Tax Regs. Here, the fair market value of the damaged property before the fire is $ 215,000, which also is the amount of petitioner's basis in the property. The property had no value after the fire. Thus, the amount of the deduction for the fire loss for 1984 is $ 20,000 ($ 215,000 (fair market value of property) minus $ 185,000 (forgiveness of debt by bank) minus $ 10,000 (additional cash tendered by bank to petitioner)). Issue 4. Petitioner Is Liable for Additions to Tax for Fraud Pursuant to Section 6653(b)(1) and (2)
Section 6653(b)(1) imposes an addition to tax equal to 50 percent of the underpayment if any part of the underpayment is due to fraud. Section 6653(b)(2) imposes an addition to tax of 50 percent of the interest payable under section 6601 with respect to that portion of *97 the underpayment that is attributable to fraud. Although respondent prevailed on the deficiency issues, respondent cannot rely on petitioner's failure to carry his burden of proof in order to sustain respondent's burden of proving fraud. See Parks v. Commissioner, 94 T.C. 654, 660 (1990). Respondent has the burden of proving that some part of the underpayment was due to fraud for purposes of section 6653(b)(1). Sec. 7454(a); Rule 142(b). For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1982); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. Fraud has been defined as "intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing". Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). To prove fraud, the Commissioner *98 must demonstrate by clear and convincing evidence that: (1) There was an underpayment of tax, and (2) some of this underpayment was due to fraud. Plunkett v. Commissioner, supra.
Respondent may satisfy her burden on the first part of the fraud test, underpayment of tax, by showing a likely source of the income. Parks v. Commissioner, supra at 661. As to the deficiencies previously discussed, respondent demonstrated by clear and convincing evidence that AW, CMW, NCSCL, Road Runner, and the pizza restaurant and Dairy Queen franchise operation were likely sources of petitioner's income. Respondent also demonstrated that petitioner had income from medical disability payments. Fraud is a question of fact to be determined from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct evidence of fraud is rarely available, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), *99 affg. T.C. Memo. 1984-601. The court in Bradford articulated numerous "badges of fraud" from which fraudulent intent can be inferred. They are: (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities. Id. Other activities that indicate fraudulent intent are engaging in illegal activities and inconsistent testimony during trial. Id. at 308; Henry v. Commissioner, 362 F.2d 640, 643 (5th Cir. 1966), affg. T.C. Memo. 1964-170. Although no single factor is determinative, the combination of a number of factors may form persuasive evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; Beaver v. Commissioner, 55 T.C. 85, 93 (1970). Respondent demonstrated that petitioner substantially understated his income for each of the years in issue. Although petitioner reported *100 only $ 30,000 in compensation income for each of the years in issue, respondent demonstrated that petitioner diverted approximately $ 112,000 from AW, CMW, and NCSCL over the 3-year period. Petitioner also failed to report approximately $ 105,000 in taxable deposits. Petitioner did not report his income from the pizza restaurant and Dairy Queen franchise operation nor did he report the medical disability benefits he received from MLI. Respondent demonstrated that petitioner kept inadequate records. Respondent further demonstrated that petitioner was aware that Edward did not include diverted checks on the income ledgers of AW, CMW, or NCSCL. Petitioner concealed these diversions by not informing Savage about the diverted amounts and by not reporting them on his Federal income tax returns. Petitioner was responsible for operating Road Runner and the pizza restaurant and Dairy Queen franchise operation. He deposited some of the income generated from Road Runner into his personal bank accounts. However, petitioner did not keep books or records for any of the businesses. His failure to keep records served to conceal income with the consequence of avoiding the payment of tax on *101 such income. Respondent demonstrated that petitioner concealed assets. By diverting checks from the various corporations, petitioner attempted to conceal the fact that that income had been generated by the corporations. Even though petitioner was aware that the checks were not reported on the corporations' books or on the corporate tax returns, petitioner did not inform Savage. Petitioner also did not report the diverted amounts on his Federal income tax returns. In addition, petitioner refrained from telling Stoffa that he owned an interest in the pizza restaurant and Dairy Queen franchise operation. He neither informed Savage about his interest in these businesses, nor included income and expenses generated from them on his personal income tax returns. When questioned by Stoffa, petitioner gave misleading answers in some instances and false answers in others. When asked if he owned businesses other than AW, CMW, and NCSCL, petitioner answered in the negative. Petitioner informed Stoffa that he had no income other than the wages and interest income that he had reported on his income tax returns. Petitioner's income tax returns did not include the diverted checks, unexplained *102 deposits, or insurance proceeds. Petitioner also informed Stoffa that he had not received any damage awards from legal actions and that he had not received any gifts during the years in issue. At trial, however, petitioner attributed part of the cash deposits to gifts from his mother. As previously stated, we do not believe that any part of the unexplained deposits came from petitioner's mother. The inconsistencies in petitioner's statements lend further support to our conclusion that petitioner's activities were motivated by a fraudulent intent to avoid taxation. See Guinn v. Commissioner, T.C. Memo. 1983-401. Finally, respondent demonstrated that petitioner had engaged in illegal activities. In March 1990, petitioner pled guilty to conspiracy to commit tax fraud for the period January 1, 1983, through March 6, 1986. Coupled with petitioner's understatement of income, concealment of assets, inadequate records, and failure to cooperate with tax authorities, this activity shows clearly and convincingly that petitioner's evasion of taxes was undertaken with fraudulent intent. Considering all the evidence, except for the underpayment with respect *103 to the $ 20,000 insurance disability benefits which petitioner received in 1985, we conclude that respondent has shown by clear and convincing evidence that all the underpayments for the years in issue were due to fraud. Consequently, we hold that petitioner is liable for the additions to tax pursuant to section 6653(b)(1) and except for the underpayment of tax with respect to the $ 20,000 insurance disability benefits, the additions to tax pursuant to section 6653(b)(2). Issue 5. Petitioner Is Liable for Additions to Tax for Substantial Understatement Pursuant to Section 6661
Section 6661 imposes an addition to tax if the amount of the understatement of income tax for the taxable year exceeds the greater of 10 percent of the tax required to be shown or $ 5,000. The amount of the addition is equal to 25 percent of the amount of any underpayment attributable to the understatement. Respondent determined that there was a substantial understatement for each of the years in issue. Petitioner bears the burden of refuting respondent's determination. Welch v. Helvering, 290 U.S. 111 (1933). In the instant case, petitioner did not address this *104 issue. We have held that taxpayers concede the section 6661 issue when they fail to address it. Rothstein v. Commissioner, 90 T.C. 488, 497 (1988). Therefore, we hold that petitioner is liable for the additions to tax pursuant to section 6661. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. In the notice of deficiency, respondent allowed petitioner a $ 200 dividend exclusion for each of the years in issue. On the joint Federal income tax returns that petitioner and his wife filed for 1984 and 1985, dividend income from undisclosed sources was reported, but excluded, in the amounts of $ 83 and $ 97, respectively. The effect of these exclusions is to reduce the otherwise available $ 200 exclusion for 1984 and 1985. Respondent now has asserted that petitioner is entitled to a $ 200 dividend exclusion for 1983, a $ 117 dividend exclusion for 1984, and a $ 103 dividend exclusion for 1985, rather than the $ 200 dividend exclusion allowed for each of the years in issue in the notice of deficiency. Petitioner did not contest respondent's reduction in the amount available as a dividend exclusion for 1984 and 1985. Thus, we deem that petitioner is conceding the reduction. In the notice of deficiency, respondent also determined that for 1984 petitioner was entitled to a $ 2,237 loss with respect to his one-fourth interest in a pizza restaurant and Dairy Queen franchise operation that was not claimed on his 1984 tax return. In respondent's posttrial brief, respondent concedes that, based on evidence adduced at trial, petitioner is entitled to an additional loss (in excess of the $ 2,237 allowed in the notice of deficiency) of $ 8,306 for 1984 with respect to the pizza restaurant and Dairy Queen franchise operation. The evidence further revealed that petitioner had unreported income of $ 2,598 in 1985 from the pizza restaurant and Dairy Queen franchise operation. Although respondent did not amend her answer to conform to the evidence, the issue as to petitioner's failure to report the aforementioned $ 2,598 of income was tried by implied consent of the parties and was raised in respondent's post-trial brief. Pursuant to Rule 41(b), we shall treat this issue as if it had been raised in the pleadings. Petitioner did not contest this item in his post-trial briefs. Thus, we deem that he is conceding the additional income. Accordingly, adjustments regarding respondent's (for 1984) and petitioner's (for 1985) concessions with respect to the pizza restaurant and Dairy Queen franchise operation should be taken into consideration in the parties' Rule 155 computation. The Rule 155 computation should also make computational adjustments to the amount of medical expense deductions claimed by petitioner for each of the years in issue.↩
2. Respondent determined DeVorah Seidenfeld to be an innocent spouse and thus entitled to relief under sec. 6013(e) from the deficiencies and additions to tax determined by respondent for the years in issue.↩
3. Edward Seidenfeld, petitioner's brother, also claims that his mother gave him cash gifts during 1983-85, which Edward claims constituted the source for bank deposits that respondent determined to be income to Edward. However, as is the case with petitioner in the instant case, we did not believe Edward in that case. See Seidenfeld v. Commissioner, T.C. Memo. 1995-62↩.