T.C. Memo. 1997-479


UNITED STATES TAX COURT


STANLEY J. ZABAN AND SHIRLEY A. ZABAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27119-93.                    Filed October 21, 1997.


<u>Paula M. Junghans</u> and <u>Caroline D. Klepper</u>, for petitioners.

<u>Alan R. Peregoy</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes:

| | | | Additions to Tax & Penalties | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6653(b)(1) | Sec. 6661 | Sec. 6663 | Sec. 6662(b)(2) |
| 1986 | $44,245 | --- | $33,184 | 1 | --- | $11,061 | --- | --- |
| 1987 | 71,567 | --- | 53,675 | 1 | --- | 17,892 | --- | --- |
| 1988 | 26,976 | --- | --- | --- | $20,232 | 6,744 | --- | --- |
| 1989 | 75,714 | $14,892 | --- | --- | --- | --- | $56,786 | --- |
| 1990 | 44,331 | --- | --- | --- | --- | --- | --- | $8,866 |

[1] 50 percent of the interest payable under sec. 6601 on the portion of the underpayment attributable to fraud.

As an alternative to the fraud additions to tax and penalty, respondent determined additions to tax for negligence or disregard of rules or regulations pursuant to section 6653(a)(1)(A) and (B) for 1986 and 1987 and section 6653(a)(1) for 1988 and an accuracy-related penalty pursuant to section 6662 for 1989.

The 1986 through 1989 deficiencies arose out of unreported income from petitioner Stanley J. Zaban's (Mr. Zaban) illegal gambling and bookmaking activities and skimming from his legitimate business activities, as well as respondent's disallowance of certain miscellaneous expense deductions for 1987 and 1988. The 1990 deficiency arose out of respondent's disallowance of both a mortgage interest deduction and a deduction for funds forfeited to the Baltimore County Police Department after the funds were seized in the execution of search warrants as proceeds from Mr. Zaban's illegal activities.

After concessions,[1] the following issues remain for decision: (1) Whether respondent properly determined that petitioners had cash on hand in the amount of $115,100 as of December 31, 1989, as part of the 1989 net worth calculation; (2) whether petitioner Shirley A. Zaban (Mrs. Zaban) qualifies for innocent spouse relief pursuant to section 6013(e) for 1986 through 1990; (3) whether Mrs. Zaban is liable for the fraud additions to tax for 1986 and 1987 pursuant to section 6653(b)(1)(A) and (B) and for 1988 pursuant to section 6653(b)(1) and for the fraud penalty for 1989 pursuant to section 6663; (4) whether Mrs. Zaban is liable for the additions to tax for negligence or disregard of rules or regulations for 1986 and 1987 pursuant to section 6653(a)(1)(A) and (B) and for 1988 pursuant to section 6653(a)(1) and for the accuracy-related penalty

---

[1] Petitioners concede the deficiencies relating to all of the unreported income, except for $115,100 determined as cash on hand as part of respondent's 1989 net worth calculation. They also concede the fraud additions to tax and penalty for 1986 through 1989 with respect to Mr. Zaban. Moreover, petitioners concede that they are not entitled to the $98,000 deduction for forfeited funds for 1990. Finally, the parties have agreed that petitioners are entitled to a $56,622 mortgage interest deduction for 1990.

Respondent disallowed petitioners' 1987 and 1988 deductions for certain miscellaneous expenses. Although petitioners disputed this determination in their petition, they did not address this issue either at trial or on brief. Because the burden of proof lies with petitioners on this issue, we hold for respondent. Rule 142(a). Additionally, and for the same reasons, we hold for respondent on the innocent spouse issue relating to the miscellaneous expense deductions. Respondent, however, did not present any evidence on the fraud additions to tax relating to the miscellaneous expense deductions, and given our finding that no fraud existed with respect to other issues, we hold for Mrs. Zaban on that issue. Rule 142(b).

for 1989 pursuant to section 6662; (5) whether petitioners are liable for additions to tax for the substantial understatement of tax pursuant to section 6661 for 1986, 1987, and 1988 and for the penalty pursuant to section 6662(b)(2) for 1990; and (6) whether petitioners are liable for the addition to tax for failure to timely file their 1989 joint return pursuant to section 6651(a)(1).

All section references are to the Internal Revenue Code as in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

<u>Background</u>

Petitioners, husband and wife, resided in Lutherville, Maryland, at the time they filed their petition. They were married in 1967 and have one daughter, Nicole.

Mr. Zaban graduated from college in 1967 and subsequently became involved in illegal gambling and bookmaking activities (described in detail below). Mrs. Zaban graduated from high school in 1964 and has no college-level education.

Between 1986 and 1990, Mrs. Zaban was a homemaker and did not work outside of the home. Mrs. Zaban was the caretaker of

petitioners' personal checking account and paid all of the household bills, including the mortgage and utility payments. Prior to the period at issue, Mrs. Zaban held various employment positions, including rater for insurance policies, receptionist at a nursing home, salesclerk at a department store, and interior decorator.

A.  Business Interests of Mr. Zaban

During 1985 and/or 1986, Mr. Zaban was a shareholder in the following entities: G&Z Corp., doing business as the Parlay Cafe (1985 through 1990); Graymar Co., Inc., which sold business equipment and supplies (1986 through 1990); Putty Hill Printing, Inc., which provided printing and copying services (1985 through 1990); and OPCZ, Inc., doing business as Zingaro's restaurant (1985 through 1987).

In 1986, upon the recommendation of Francis E. Fidati, CPA, petitioners' personal and business accountant, Mr. Zaban formed and was the sole shareholder of Zaban Enterprises, Inc., a subchapter S corporation, for the purpose of paying himself a salary, as well as distributions, from interests in his other business entities. Mrs. Zaban was an officer of Zaban Enterprises; she signed corporate employment and income tax returns, signed the election to become a subchapter S corporation, maintained the corporate checking account, and wrote substantially all the checks from that account.

In or about August 1985, Mrs. Zaban, along with Gary Genovese, a shareholder with Mr. Zaban in the Parlay Cafe, filed an application for a liquor license for the Parlay Cafe with the Board of Liquor License Commissioners for Baltimore County. The application falsely stated that Mrs. Zaban had a 50-percent ownership interest in G&Z, Corp., the entity that owned the Parlay Cafe. Moreover, the application failed to disclose that Mr. Zaban had an interest in G&Z, Corp. The renewal applications for 1988 and 1991 contained the same false declaration and omitted the same information.

Each application contained a question as to whether any of the applicants had been convicted of violating gambling laws. Had Mr. Zaban been listed as one of the applicants, the Parlay Cafe might have been denied a liquor license.

## B. Criminal Record and Activity of Mr. Zaban

Prior to 1978, Mr. Zaban became involved in bookmaking activities with Herman "Lefty" Neumyer. In 1978, Messrs. Zaban and Neumyer were arrested and convicted of bookmaking. Mrs. Zaban knew of her husband's bookmaking activities with Mr. Neumyer. She also knew of her husband's conviction.

On August 2, 1990, Mr. Zaban was charged with illegal possession of flash paper, a material used by bookmakers for the purpose of destroying records of their activity. The flash paper was discovered in a March 1990 search of Mr. Zaban's Mercedes Benz

pursuant to a warrant.  On August 30, 1990, Mr. Zaban pled guilty in the District Court of Baltimore to conspiracy to gamble.

On September 21, 1990, Messrs. Zaban and Neumyer were arrested in the parking lot of the Quality Inn Motel in Towson, Maryland, and charged with illegal wagering on a baseball and a football game, and conspiracy to gamble.  The Government, however, did not pursue the charges.

On or about June 25, 1992, the U.S. Attorney for the District of Maryland filed a four-count information charging Mr. Zaban with illegal gambling and bookmaking, money laundering, bank fraud, and tax evasion (for 1989 only).  Mr. Zaban pled guilty to each count as part of a plea bargain with the U.S. Attorney's Office, and judgment was entered by the U.S. District Court for the District of Maryland on October 27, 1992.  The plea agreement also included a stipulation that Mr. Zaban had engaged in skimming cash from the Parlay Cafe.

Mr. Zaban's accountant, Mr. Fidati, also pled guilty to assisting in the preparation and filing of a false tax return by failing to report the income from the illegal bookmaking and gambling activities, as well as the income skimmed from the Parlay Cafe.

### 1.  Illegal Gambling and Bookmaking

Pursuant to the Federal information to which Mr. Zaban pled guilty in October 1992, Mr. Zaban admitted that from May 1, 1986,

through March 23, 1992, he was engaged in illegal gambling and bookmaking activities out of his home and in other locations within the State of Maryland. He engaged in these bookmaking operations with Mr. Neumyer and others. The bookmaking operations were confined to sports betting, primarily on collegiate and professional basketball and football.

Mr. Zaban's role in the operation was to obtain customers, record bets, distribute winnings, and collect losses. Mr. Zaban also placed bets on his own account several times a week and often traveled to Las Vegas and Atlantic City to gamble and watch boxing fights, trips of which Mrs. Zaban was aware. Mr. Zaban's share of the bookmaking proceeds was 25 percent. The bookmaking operation grossed more than $2,000 per day.[2]

Mr. Zaban maintained an office for conducting these bookmaking and gambling activities in the basement of petitioners' home. Mr. Zaban kept no regular work hours at home or in other places and occasionally met with Mr. Neumyer at a local bar, at times when Mrs. Zaban was present. At his desk in the basement, Mr. Zaban kept betting records, bottom sheets, sports schedules, and a telephone with two tape recorders that were hard-wired to petitioners' two phone lines so that he could record conversations

---

[2]    In a closing agreement with the Internal Revenue Service, Mr. Zaban conceded that the daily net profit from the bookmaking operation was $5,800, and that he had a 50-percent share or $2,900 per day.

with customers and refute any challenges to bets. Also in the basement, Mr. Zaban kept a toolbox with a combination lock that was used to store his share of cash proceeds from bookmaking and gambling activities, as well as cash he skimmed from the Parlay Cafe. During the execution of a search warrant in March 1990, the Baltimore County Police Department found $47,250 in cash and 17 $50 gold pieces in the toolbox. The toolbox was later moved and hidden in an upstairs crawl space at the home of Mrs. Zaban's parents, the DeFranks. Upon the execution of a search warrant at the DeFranks' home in March 1992, the police discovered various papers associating Mr. Zaban with gambling and bookmaking activities, $62,700 in Bethlehem Steel bearer bonds, 590 $100 bills, and 20 $50 bills. Although the toolbox was somewhat obscured while in petitioners' basement, the tape recorders were in plain sight on Mr. Zaban's desk.

From petitioners' basement, Mr. Zaban made and received telephone calls to and from Mr. Neumyer and others involved in the gambling and bookmaking activities. Mrs. Zaban occasionally answered the telephone in their home and at times spoke with Mr. Neumyer. Sometime in 1991, the Baltimore County Police Department obtained an order from the Circuit Court for Baltimore County to place a dialed number recorder (DNR) on the two phone lines at petitioners' residence in Lutherville, Maryland, for the purpose of recording the number of incoming and outgoing activations on those

lines.  The DNR analysis performed by the Baltimore County Police Department between November 21, 1991, and January 30, 1992, revealed 3,360 activations on one line, of which 3,231 were outgoing and 129 were incoming, and 1,097 activations on the other line, of which 635 were outgoing and 462 were incoming.  The first line had an average of 47 telephone calls per day, and the second line had an average of 15 telephone calls per day.

2. Money Laundering

Mr. Zaban engaged in two different schemes to launder the money he obtained from his illegal gambling and bookmaking activities.  The first scheme involved alleged loan payments to Mr. Fidati.  Mr. Zaban gave Mr. Fidati $4,000 per month in cash during 1986, 1987, and 1988, and Mr. Fidati repaid Mr. Zaban by writing two checks in odd amounts, totaling $4,000 per month, payable to either Mr. Zaban or Zaban Enterprises.  This scheme was the basis for the money laundering charge to which Mr. Zaban pled guilty.

As part of her role in Zaban Enterprises, Mrs. Zaban often deposited checks into the entity's account, including those from Mr. Fidati, and in turn wrote salary and distribution checks to her husband from that account.  The amounts of the checks to Mr. Zaban were based on a schedule prepared by Mr. Fidati. Mrs. Zaban understood the checks from Mr. Fidati to Zaban Enterprises to represent loan repayments to Mr. Zaban, but she never questioned the odd amounts of the repayments.

The second money laundering scheme, which for purposes of the 1992 plea bargain with the U.S. Attorney's Office could not be proven, involved payments to Westco Manufacturing Co. (Westco) in California during 1989. Mr. Zaban paid his friend Roy Burger $41,569, and in exchange, Westco, for whom Mr. Burger worked and was earning commissions, paid Zaban Enterprises with checks totaling $41,569. Mrs. Zaban was aware of these transactions and the deposits of checks from Westco to Zaban Enterprises. Mrs. Zaban believed that these were consulting fees for work performed by Mr. Zaban for Westco, but she did not know the nature of the work performed by Mr. Zaban.

### 3. Bank Fraud

In early 1988, petitioners decided to acquire a new home. Mrs. Zaban met with Kathryn Gerling, president of Midstate Savings and Loan (Midstate), to begin the process of applying for a loan. (To a large extent Mrs. Zaban negotiated the terms of the loan with Ms. Gerling.) On February 26, 1988, petitioners submitted an application to Midstate for a $101,000 acquisition loan to purchase a residential lot in Lutherville, Maryland. The loan application listed monthly income of $12,200, assets of $683,293.65, and a net worth of $520,325.65.

On or about August 23, 1988, petitioners submitted an application to Midstate for a $528,700 construction loan to build their home on the lot in Lutherville, Maryland, pursuant to a

$660,923 construction contract. The loan application listed monthly income of $13,750, assets of $819,293.65, and a net worth of $555,325.65.

As part of the loan application process, petitioners were required to submit their Federal income tax returns for 1986 and 1987. The returns that were hand delivered to Ms. Gerling by either Mr. or Mrs. Zaban reported gross income before adjustments of $160,115 for 1986 and $165,263 for 1987, even though the returns prepared and filed with the Internal Revenue Service (IRS) reported gross income before adjustments of $66,195 for 1986 and $101,963 for 1987. Mr. Zaban prepared the fraudulent returns submitted to Midstate for the purpose of persuading the savings and loan to approve the loan applications. These fraudulent returns were the basis for the bank fraud charge to which Mr. Zaban pled guilty.

Petitioners completed construction of the Lutherville, Maryland, home and began occupying it in or about June 1989. The design of the home was the subject of an article in the Baltimore Sun in October 1990.

C. Cash Found in Safe Deposit Boxes

In March 1990, a search warrant was executed by the Baltimore County Police Department at the Mercantile Safe Deposit & Trust Company, and three safe deposit boxes were searched. Box 3631, held in petitioners' names, contained a photo album which was not seized. Box 3567, held in the names of Mr. Zaban and Loretta

Neumyer, the wife of Mr. Neumyer, contained $45,000 in cash, all $100 bills, and a deposit slip with handwritten notations. Only Mr. Zaban entered this box. The contents of this box were seized. Mr. Zaban used the deposit slip notations to keep track of the cash in the safe deposit box, which indicated the presence of $115,000 in cash on January 2, 1990. On that date, $40,000 was removed; on January 9, 1990, $20,000 was removed; on February 13, 1990, $10,000 was removed. A balance of $45,000 remained.

Box 2164, held in petitioners' names, contained $40,100 in cash, all $100 bills, and a deposit slip with handwritten notations. Mr. Zaban used the deposit slip notations to keep track of the amount of cash in the box. On January 2, 1990, the deposit slip notations indicated the presence of $40,100 in cash in the box, which was placed in the box on January 2, 1990, the same date and time as the removal of the $40,000 from Box 3567.

D. Loans by Mr. Zaban

Between 1985 and 1989, Mr. Zaban made several large loans. Sometime prior to December 31, 1985, Mr. Zaban lent $93,100 to F. Frank Culotta, a friend. In 1988, $30,626 of the aforementioned loan was repaid upon the sale of an Ocean City, Maryland, condominium that petitioners owned together with Mr. Culotta. The balance of the loan to Mr. Culotta remained unpaid as of December 31, 1989. During 1987, Mr. Zaban lent $52,000 in cash to Keith Vazquez (who is married to Mr. Zaban's niece), which remained

unpaid as of December 31, 1989. Sometime prior to December 31, 1985, Mr. Zaban lent James Donohue $10,000 in cash, which remained unpaid as of December 31, 1989. During 1988, Mr. Zaban lent Splenanne, Ltd. $4,623.87, of which $1,824 was repaid in 1989, and the balance remained unpaid as of December 31, 1989. Mrs. Zaban was not involved in any of these loan transactions.

E. Petitioners' Lifestyle

In 1978, petitioners acquired a home in Phoenix, Maryland, for $96,899, which was financed through a mortgage. The property was sold on February 1, 1990, for $185,000, with a $46,901 balance on the mortgage. The mortgage payment on the Phoenix, Maryland, residence was approximately $500 per month.

Following construction of petitioners' home in Lutherville, Maryland, in mid-1989, the monthly mortgage payment became $4,935.32, with a balloon payment of $445,213.99 due on October 1, 2003. Mrs. Zaban was aware of the mortgage payments on the home.

In 1989, petitioners furnished their home with $29,893.38 in furniture from three stores and, in 1990, acquired a $12,800 Andy Warhol painting. During 1989 and 1990, petitioners acquired several other paintings, including: Lily Pond, appraised for insurance purposes for $4,400; Flowers and Flowers, for $4,900; Golden Teardrops, for $3,200 and appraised for insurance purposes for $3,900; and Magical Vase, appraised for insurance purposes for

$4,000.   In 1989, petitioners also acquired a Chinese marble-top chest for $2,500.

During 1986 and 1987, petitioners acquired a one-half interest in an Ocean City, Maryland, condominium together with Mr. Culotta and his wife. Petitioners paid $32,450 for their share of the condominium and furnishings, and financed their share with a $26,546 mortgage. In 1988, the condominium was sold when petitioners' share of the mortgage was $26,722.

As of December 31, 1985, petitioners owned three cars:  A 1984 Cadillac worth $21,581.53 with a loan balance of $8,462.53, which was paid off in 1987; a 1985 Pontiac Grand Prix worth $13,124 with a loan balance of $7,010.10, which was paid off in 1986; and a 1981 Pontiac Grand Prix worth $9,885, which petitioners owned outright. In 1986, petitioners acquired two additional cars:  A 1986 Mercedes Benz for $47,504, with a loan of $46,457 and a balance due of $27,023.20 as of December 31, 1989; and a 1986 Volkswagen Cabriolet for their daughter worth $14,495, with a loan of $7,087, which was paid off in 1988.  In 1987, petitioners acquired a 1987 Mercedes Benz for $37,159, with a loan of $24,006 and a balance due of $19,321.33 as of December 31, 1989.

In April 1986, Mr. Zaban opened a brokerage account with Paine Webber, Inc.; as of September 29, 1989, the portfolio value of that account was $413,032.97.  Mr. Zaban maintained a brokerage account with Baker, Watts & Co. with a portfolio value of $136,426.26 as of

December 31, 1985, and a portfolio value of $333,507.66 as of December 31, 1989. Mr. Zaban maintained a brokerage account with Thompson McKinnon with a portfolio value of $7,954.92 as of December 31, 1985, and a portfolio value of $22,183.09 as of December 31, 1989. Mrs. Zaban was aware of these brokerage accounts.

Between 1986 and 1989, petitioners paid for their daughter's college education at Loyola College in the amount of $6,679.16 in 1986, $7,830.97 in 1987, $8,073.13 in 1988, and $4,062.50 in 1989.

Between 1986 and 1989, petitioners held memberships at Chestnut Ridge Country Club, Merritt Racquetball Club (where Mr. Zaban played racquetball), and Greenspring Racquet Club (where Mrs. Zaban played tennis).

Between 1986 and 1989, petitioners had credit card payments on 14 credit cards totaling $7,522.23 in 1986, $11,747.41 in 1987, $31,371.12 in 1988, and $33,238.49 in 1989.

In 1988, petitioners paid $3,368.70 to World Travel for a trip, and in 1989, petitioners paid $7,088.75 on jewelry at Radcliff & Co.

Mrs. Zaban participated in the purchase of the home furnishings, artwork, flatware, and jewelry, in addition to clothes and fur coats, and was aware of other expense items.

F.  Preparation and Filing of Federal Tax Returns

Petitioners' 1984 and 1985 Federal joint income tax returns (which are not in issue) were prepared by petitioners' attorney, George Breschi.  The 1984 return (signed by both petitioners) reported gross income before adjustments of $67,886 and gambling income of $48,500.  The 1985 return (signed by both petitioners) reported gross income before adjustments of $74,860 and gambling income of $45,000.

Petitioners' Federal joint income tax returns for 1986 through 1990 were prepared by Mr. Fidati, petitioners' personal and business accountant during those years.  The 1986 return (signed by both petitioners) reported gross income before adjustments of $66,195 and listed no gambling income.  The 1987 return[3] reported gross income before adjustments of $101,963 and listed no gambling income.  The 1988 return (signed by both petitioners) reported gross income before adjustments of $106,129 and listed no gambling income.

The 1989 return (signed by both petitioners and filed on October 18, 1990, following a filing extension to August 15, 1990), reported gross income before adjustments of $165,437 and $60,000 of

---

[3]    Mrs. Zaban did not sign the original 1987 joint return when it was filed.  The Internal Revenue Service detected the error and informed petitioners.  Mrs. Zaban signed a declaration on July 8, 1988, indicating that she had reviewed the 1987 joint return and that it was true, correct, and complete.

gambling income. The 1989 return was filed following the execution of search warrants by the Baltimore County Police Department at petitioners' residence, a bank, and one of Mr. Zaban's businesses, in which evidence of illegal gambling and bookmaking activities was seized.

In October 1990, Mr. Zaban entered into a closing agreement with the IRS, terminating the 1990 tax year as of March 24, 1990.[4] Mr. Zaban agreed to report the net profits from his gambling and bookmaking activities. The 1990 return (signed by both petitioners) reported gross income before adjustments of $289,560 and gambling income of $240,700 (before expenses) on Schedule C in accordance with the closing agreement.

Mrs. Zaban provided Messrs. Breschi and Fidati with records and other information necessary to prepare petitioners' returns for 1984 through 1990. She never reviewed their work to determine whether the returns were true and accurate. At times, Mr. Fidati would provide Mrs. Zaban with returns prepared in pencil and would have her sign blank returns.

---

[4] Closing agreements resolve liability issues only for the taxable years covered by the agreements. Sec. 7121; sec. 601.202(a), Statement of Procedural Rules. Thus, the termination of the 1990 tax year on March 24, 1990, conclusively resolved, for purposes of the closing agreement, only the issues for that period. Respondent was permitted to issue notices of deficiency relating to issues and time periods not covered by the agreement.

As of October 1990, at a time in which Mrs. Zaban was aware of Mr. Zaban's gambling and bookmaking activities, Mrs. Zaban knew she should not rely on Mr. Fidati to prepare their returns. Despite this concern, Mrs. Zaban signed the 1989 and 1990 joint returns without reviewing them.

G. Notice of Deficiency

Pursuant to a reconstruction of petitioners' income under the net worth method, respondent determined that petitioners had unreported income from illegal gambling and bookmaking activities for 1986 through 1989 in the following amounts: $101,599.43 for 1986; $183,991.39 for 1987; $82,902.23 for 1988; and $255,623.58 for 1989. Petitioners concede that these figures are correct except for the 1989 determination. The parties disagree whether $115,100 in cash that existed in a safe deposit box on December 31, 1989, was attributable to petitioners.

Respondent further determined additions to tax for fraud for 1986 through 1988 and the fraud penalty for 1989 against Mrs. Zaban, additions to tax for substantial understatement of tax for 1986, 1987, and 1988, an addition to tax for failure to timely file the 1989 joint return, and an accuracy-related penalty for substantial understatement of tax for 1990. As an alternative to the fraud additions to tax and penalty, respondent determined additions to tax for negligence or disregard of rules or regulations for 1986 through 1988, and an accuracy-related penalty

for negligence or disregard of rules or regulations for 1989 against Mrs. Zaban.

OPINION

Issue 1.  1989 Net Worth Calculation

The first issue for decision is whether respondent properly determined $115,100 as cash on hand as part of the 1989 net worth calculation.  Petitioners assert that the cash belonged to Mr. Neumyer.

The net worth method has been approved as a means of reconstructing the income of taxpayers who fail to report income and do not maintain adequate books and records.  Holland v. United States, 348 U.S. 121 (1954); Lias v. Commissioner, 235 F.2d 879, 880 (4th Cir. 1956), affg. 24 T.C. 280 (1955); Estate of Beck v. Commissioner, 56 T.C. 297, 353-354 (1971).  Deficiencies determined by indirect methods generally are presumed correct, Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968), affg. T.C. Memo. 1967-67, and taxpayers bear the burden of proving that such deficiencies are erroneous, Rule 142(a); Parks v. Commissioner, 94 T.C. 654, 658-659 (1990).  The net worth method requires a finding of both the beginning and ending net values of a taxpayer's assets. Holland v. United States, supra at 125.

Mr. Zaban asserts that the contents of box 3567, in which the $115,100 cash was found, belonged to Mr. Neumyer.  Mr. Zaban claims that Mr. Neumyer gave him between $155,000 and $175,000 in 1984 to

hold for safekeeping. According to Mr. Zaban, Mr. Neumyer gave him the money because Mr. Neumyer was going to Las Vegas for several weeks; and while there, Mr. Neumyer wanted Mr. Zaban to be in a position to pay off Mr. Neumyer's obligations to certain individuals in connection with Mr. Neumyer's bookmaking operations. Mr. Zaban testified that after Mr. Neumyer's return from Las Vegas, Mr. Neumyer never asked him to return the funds.[5]

Mr. Zaban's testimony was self-serving and lacked credibility. The evidence reflects that on January 2, 1990, $40,000 in cash was transferred from box 3567, a box controlled by Mr. Zaban to which he had the key and which he was the only person ever to open, to box 2164, a safe deposit box held in petitioners' names. Petitioners offered no testimony and produced no evidence indicating that the $40,000 deposited in box 2164 came from a source other than box 3567. Petitioners failed to prove that Mr. Zaban lacked discretion and control over entry to box 3567 and the use of the cash in that box. See Pert v. Commissioner, T.C. Memo. 1997-150. Petitioners have failed to establish a nontaxable source for the cash that existed in box 3567. We conclude that the $115,100 is properly attributed to petitioners as cash on hand for respondent's net worth calculation for 1989.

Petitioners' argument that respondent failed to meet each of the elements of the net worth method, including the beginning cash

_____

[5] Mr. Neumyer died prior to the date of trial.

on hand balance, is without merit.  The parties stipulated the correctness of all aspects of the net worth method other than the ending cash on hand balance on December 31, 1989.  Petitioners' contention that a cash hoard existed at the beginning of 1989 is inconsistent with the stipulation of a zero cash on hand balance at the end of 1988 and with petitioners' argument that safe deposit box 3567 did not belong to Mr. Zaban.

Accordingly, we sustain respondent's determination of $115,100 as the ending cash on hand balance for the 1989 net worth calculation.

Issue 2.  Innocent Spouse

The second issue for decision is whether Mrs. Zaban is entitled to innocent spouse relief.  Mrs. Zaban asserts that she is entitled to such relief for 1986 through 1990.  Respondent argues that Mrs. Zaban fails to meet three of the four statutory elements for relief.

Spouses who file a joint income tax return generally are jointly and severally liable for its accuracy and the tax due, including any additional taxes, interest, or penalties determined on audit of the return.  Sec. 6013(d)(3).  However, pursuant to section 6013(e), a spouse (commonly referred to as an innocent spouse) can be relieved of tax liability if that spouse proves: (1) A joint income tax return was filed; (2) the return contained a

substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the spouse seeking relief did not know, and had no reason to know, of the substantial understatement; and (4) under the circumstances it would be inequitable to hold the spouse seeking relief liable for the understatement. Sec. 6013(e). The spouse seeking relief bears the burden of proving that each of the four elements of the statute has been satisfied, and failure to prove any one of the elements will prevent innocent spouse relief. Bokum v. Commissioner, 94 T.C. 126, 138-139 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

Respondent concedes that a joint return was filed for each of the years in issue, and thus the first element is not disputed. The innocent spouse issue can be disposed of on the third and fourth elements.

a. Knowledge of Understatement

Mrs. Zaban asserts that she did not know, nor had reason to know, of the substantial understatement of tax on the joint return for each of the years in issue. Respondent contends that Mrs. Zaban knew or should have known about the unreported income items for 1986 through 1989 and knew or should have known about the $98,000 deduction for forfeited funds for 1990.

To obtain innocent spouse relief for tax liabilities that arise from omissions of income, the spouse seeking such relief must

be unaware of the circumstances which gave rise to the omissions. Purcell v. Commissioner, 86 T.C. 228, 238 (1986), affd. 826 F.2d 470 (6th Cir. 1987). The spouse seeking relief must demonstrate lack of both actual and constructive knowledge of the omission such that a reasonable person could not be expected to know that the tax liability stated was erroneous or that further inquiry was necessary. Stevens v. Commissioner, 872 F.2d 1499, 1504-1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63.

Mrs. Zaban's claim that she knew nothing, nor had any reason to know, about Mr. Zaban's illegal activities, is not credible given the record before us. To be sure, Mrs. Zaban knew that Mr. Zaban had been convicted in 1978 of bookmaking with Mr. Neumyer and that Messrs. Zaban and Neumyer continued to deal with each other on a regular basis, both in person and on the telephone, throughout the years in issue. Mrs. Zaban also knew that Mr. Zaban traveled frequently to Las Vegas and Atlantic City. Mrs. Zaban was aware that Mr. Zaban did not work regular hours, and that he made or received unusually high volumes of telephone calls. Further, Mrs. Zaban knew that Mr. Zaban worked only in their basement where he kept betting records and other gambling paraphernalia, tape recorders hard-wired to the telephone lines, and a toolbox for storing large amounts of cash, all of which were readily visible to anyone who passed through the basement.

Mrs. Zaban testified that she never reviewed any of the tax returns, liquor license applications, or loan applications she signed. Her testimony that she was unaware of any of the contents in these documents lacks credibility. In any case, the fact that Mrs. Zaban failed to review any tax returns she signed, or to sign blank tax returns that were completed at a later time, does not permit Mrs. Zaban to plead ignorance and does not absolve her of liability for her husband's omissions. See Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Edmondson v. Commissioner, T.C. Memo. 1996-393; Cohen v. Commissioner, T.C. Memo. 1987-537. Had Mrs. Zaban reviewed the 1984 and 1985 joint returns, she would have discovered that nearly two-thirds of the reported gross income before adjustments resulted from gambling; and had she reviewed the 1986, 1987, and 1988 joint returns, she would have found that no such gambling income was reported in those years. See Zimmerman v. Commissioner, T.C. Memo. 1996-223. Further, she would have discovered that the reported income for 1986 and 1987 was inconsistent with the figures reported on the loan applications submitted to Midstate, the savings and loan institution with which she personally negotiated and discussed the loan requirements and terms for the construction of the Lutherville, Maryland, home. See Silverman v. Commissioner, T.C. Memo. 1994-153.

Mrs. Zaban was also the self-described caretaker of petitioners' personal checking account and thus was aware of both the family income and expenses. See Zimmerman v. Commissioner, supra; Alberts v. Commissioner, T.C. Memo. 1986-483. She was also charged with maintaining the corporate checking account for Zaban Enterprises in which she made deposits and signed salary and distribution checks to her husband, as well as drafting most other corporate checks. See Morris v. Commissioner, T.C. Memo. 1992-635, affd. without published opinion 15 F.3d 1079 (5th Cir. 1994). As a consequence, she was aware of the unusual deposits from Mr. Fidati and Westco. This role in the family's personal and business finances gave Mrs. Zaban the opportunity to learn about whether reported income was consistent with Mr. Zaban's success in his business ventures. Mrs. Zaban's testimony that she was unaware of Mr. Zaban's success in his business activities is simply not believable.

Most critically though, Mrs. Zaban was on notice of the lavish lifestyle she was enjoying. See Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979); Ayer v. Commissioner, T.C. Memo. 1989-614. During 1986, 1987, and 1988, petitioners had reported gross income before adjustments of $66,195, $101,963, and $106,129, respectively, and were still living in their modest home. Yet during that time petitioners had acquired and accumulated a condominium share and seven automobiles, two of which were new Mercedes Benzes; paid for their daughter's entire private college

education; become members of three country or racquet clubs; and taken a $3,300 vacation.

During the latter part of 1988 and through 1990, this lavish lifestyle became even more apparent. Mrs. Zaban was directly involved in the process of negotiating a $101,000 residential lot loan, as well as a $528,700 construction loan for the building of their Lutherville, Maryland, home. Following completion of the new home in which the monthly mortgage payment increased from approximately $500 per month to nearly $5,000 per month, which was paid by Mrs. Zaban, she participated in the furnishing of that home, which included about $60,000 in purchases. Mrs. Zaban was also involved in the purchase of over $7,000 in jewelry during 1989 and accumulated a wardrobe filled with fur coats and other clothes throughout the period in issue.

Given all of the facts and circumstances, we are convinced, and thus hold, that Mrs. Zaban knew or should have known of the substantial understatement on petitioners' returns for 1986 through 1990 and thus is not entitled to innocent spouse relief.

b. Inequity in Holding Mrs. Zaban Liable

It would also not be inequitable to hold Mrs. Zaban liable for the deficiencies for the years in issue. The record demonstrates that Mrs. Zaban significantly benefited from the underreported income and from the impermissible deductions (e.g., the large home and furnishings, cars, fur coats and other clothings, club

memberships, expensive vacation), and she admitted such at trial. See <u>Berman v. Commissioner</u>, T.C. Memo. 1993-629, affd. without published opinion 47 F.3d 1158 (2d Cir. 1995); <u>Ewell v. Commissioner</u>, T.C. Memo. 1988-265; sec. 1.6013-5(b), Income Tax Regs. She enjoyed a good life that went well beyond normal support. See <u>Terzian v. Commissioner</u>, 72 T.C. 1164, 1172 (1979).

<u>Issue 3. Fraud Additions to Tax and Penalty for 1986-89</u>

The third issue for decision is whether Mrs. Zaban is liable for fraud. Respondent determined fraud additions to tax against Mrs. Zaban for 1986 and 1987 pursuant to section 6653(b)(1)(A) and (B) and for 1988 pursuant to section 6653(b)(1) and a penalty for 1989 pursuant to section 6663.[6] Mrs. Zaban asserts that she lacked any actual knowledge of the unreported income items not reported in the returns for 1986 through 1989.

The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal,

---

[6]     For 1986 and 1987, sec. 6653(b)(1)(A) imposed an addition to tax equal to 75 percent of the portion of the underpayment attributable to fraud, and sec. 6653(b)(1)(B) imposed an addition to tax equal to 50 percent of the interest payable under sec. 6601 with respect to that portion of the underpayment.
    For 1988 and 1989, sec. 6653(b)(1) and sec. 6663, respectively, imposed additions to tax and penalties consisting of 75 percent of the portion of the underpayment attributable to fraud.

mislead, or otherwise prevent the collection of such taxes. Parks v. Commissioner, 94 T.C. at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud is never presumed, Beaver v. Commissioner, 55 T.C. 85, 92 (1970), and cannot be imputed from one spouse to another, Stone v. Commissioner, 56 T.C. 213, 227-228 (1971).

Respondent has failed to sustain the burden of proof. Respondent has not established that Mrs. Zaban knew of the understatement on petitioners' joint returns given her failure to review any of the returns or her signing of blank returns. See Ewell v. Commissioner, supra. Additionally, there was no evidence presented that Mrs. Zaban was involved in preparing the returns, other than providing documentation to the accountant, Mr. Fidati. Even though we believe Mrs. Zaban knew of Mr. Zaban's illegal gambling and bookmaking activities, we cannot conclude from the record that Mrs. Zaban knew that income from such activities was not being reported. See Flynn v. Commissioner, T.C. Memo. 1981-491. On the basis of the entire record in this case, we are not persuaded that Mrs. Zaban intended to evade taxes and defraud the Government. Thus, we hold that Mrs. Zaban is not liable for the additions to tax and penalty for fraud for 1986 through 1989.

Issue 4. Negligence or Disregard of Rules or Regulations

The fourth issue for decision is whether Mrs. Zaban is liable for additions to tax and penalty for negligence or disregard of

rules or regulations. As an alternative to the fraud additions to tax and penalty for 1986 through 1989, respondent determined additions to tax for negligence or disregard of rules or regulations pursuant to sections 6653(a)(1)(A) and (a)(1)(B) for 1986 and 1987 and section 6653(a)(1) for 1988 and an accuracy-related penalty pursuant to section 6662 for 1989.

The addition to tax for negligence or disregard of rules or regulations, or the accuracy-related penalty, cannot be imposed on one spouse (here, Mrs. Zaban) where the other spouse (here, Mr. Zaban) is liable for fraud. Unlike the fraud addition to tax which is imposed on each spouse separately even if a joint return is filed, sec. 6663(c); sec. 301.6653-1(f), Proced. & Admin. Regs., the negligence addition to tax and the accuracy-related penalty apply jointly and severally. Thus, where a joint return is filed and one spouse is liable for fraud with respect to the entire underpayment, the imposition of the negligence addition to tax or accuracy-related penalty with respect to the other spouse would result in impermissible stacking. Sec. 6662(b); Aflalo v. Commissioner, T.C. Memo. 1994-596; Minter v. Commissioner, T.C. Memo. 1991-448; Congelliere v. Commissioner, T.C. Memo. 1990-265. Thus, we hold that Mrs. Zaban cannot be liable, and thus is not liable, for the additions to tax for negligence or disregard of rules or regulations, or the accuracy-related penalty for negligence or disregard of rules or regulations, for 1986 through 1989.

## Issue 5.  Substantial Understatement Additions to Tax

The fifth issue for decision is whether petitioners are liable for additions to tax for the substantial understatement of tax for 1986, 1987, and 1988 and an accuracy-related penalty for substantial understatement of tax for 1990.  Respondent determined additions to tax for the substantial understatement of tax pursuant to section 6661 for 1986, 1987, and 1988, and an accuracy-related penalty pursuant to section 6662 for 1990.[7]  Mrs. Zaban asserts that she had reasonable cause and acted in good faith for those years and thus is excepted from the substantial understatement addition to tax and the accuracy-related penalty pursuant to section 6664(c).

Mrs. Zaban's argument is without merit.  The reasonable cause exception to the addition to tax for the substantial understatement of tax and the accuracy-related penalty for substantial understatement of tax are not applicable to taxpayers filing tax returns prior to December 31, 1989.  Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. 101-239, sec. 7721(a), 103 Stat. 2106, 2395.  Thus, the reasonable cause exception does not apply to

---

[7]     For tax years 1986, 1987, and 1988, sec. 6661 imposed additions to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement.  A substantial understatement is defined as an understatement which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6661(b).
    For tax year 1990, sec. 6662 imposed an accuracy-related penalty of 20 percent of the underpayment attributable to a substantial understatement.

petitioners' 1986, 1987, and 1988 returns. In any case, Mrs. Zaban lacks reasonable cause and good faith for each of the years in issue. Mrs. Zaban never reviewed the returns prepared by Mr. Fidati and occasionally signed blank returns. Her failure to review the returns and her blind reliance on Messrs. Zaban and Fidati were not reasonable. See Bollaci v. Commissioner, T.C. Memo. 1991-108; Guinn v. Commissioner, T.C. Memo. 1983-401. Additionally for 1990, Mrs. Zaban admitted that she had reason to be suspicious of Mr. Fidati's preparation of petitioners' returns after October 1990, and yet she never reviewed the 1990 return. See Baugh v. Commissioner, T.C. Memo. 1996-70; Brown v. Commissioner, T.C. Memo. 1992-15; sec. 1.6664-4(b), Income Tax Regs.

We conclude that Mrs. Zaban is liable for the additions to tax for the substantial understatement of tax for 1986 through 1988, and for the accuracy-related penalty for 1990.

The fact that Mr. Zaban has conceded the fraud additions to tax for 1986, 1987, and 1988 is irrelevant. Mr. Zaban may be held liable for both additions to tax for fraud and additions to tax for substantial understatement of tax for those years. OBRA sec. 7721(a). Thus, we hold that Mr. Zaban is liable for the substantial understatement additions to tax for 1986 through 1988 and for the accuracy-related penalty for 1990.

Issue 6.  Addition to Tax for Failure To File

The final issue for decision is whether petitioners are liable for the addition to tax for failure to timely file their 1989 joint return.  Respondent determined an addition to tax of 15 percent for petitioners' failure to timely file their 1989 return.  Mrs. Zaban asserts a reasonable cause defense.

Section 6651(a)(1) imposes an addition to tax of 5 percent for each month or fraction thereof in which an income tax return is not filed after the prescribed filing date.  An exception is provided for reasonable cause not the result of willful neglect.  Id.

Petitioners were granted an extension for filing their 1989 joint return to August 15, 1990, but did not file the return until October 18, 1990.  Petitioners did not establish reasonable cause for the failure to timely file their 1989 return, and thus they failed to meet their burden of proof.  Rule 142(a).  We hold that petitioners are liable for the addition to tax under section 6651(a)(1).

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.